The STATE OF OHIO, Appellee,

v.

HOPFER, Appellant.

[Cite as *State v. Hopfer* (1996), 112 Ohio App.3d 521.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. 15345.

Decided July 12, 1996.

526

528

530

*Carley J. Ingram*, Montgomery County Assistant Prosecuting Attorney, for appellee.

**532**

*Matthew Ryan Arntz* and *Michael L. Monta,* for appellant.

FAIN, Judge.

Defendant-appellant Rebecca L. Hopfer appeals from her convictions for murder and gross abuse of a corpse. Hopfer asserts sixteen assignments of error. Because we find none of her assignments of error to have merit, the judgment of the trial court is affirmed.

I

In November 1993, defendant-appellant Rebecca L. Hopfer was a junior at Centerville High School. Shortly after her seventeenth birthday, Hopfer engaged in sexual intercourse with a boy from school. After missing her next menstrual cycle, Hopfer confided to her friend, Mary Hanaghan, that she might be pregnant. In January 1994, Hopfer and Hanaghan bought a home pregnancy test at a local pharmacy, and Hopfer performed the test on herself at Hanaghan's home. The test indicated a positive result.

Over the following months, Hopfer did not disclose her pregnancy to her parents or other relatives. Hopfer continued to conduct her regular activities and attended several social functions, including a family reunion and a marching band summer camp, without drawing attention to her pregnant condition. On August 14, 1994, Hopfer awoke with labor pains that continued throughout the morning. She spent the morning and early afternoon working at an ice cream social with her parents. Around 2:30 p.m., she left the ice cream social complaining of "bathroom" problems and went home. Throughout the day, her contractions became more frequent and intense. Around 7:00 p.m., after her father had left for work, Hopfer went to her bathroom to deliver the baby. After breaking her water with her fingernail, Hopfer gave birth to a baby girl. She cut the umbilical cord with a pair of scissors, and flushed the afterbirth down the toilet.

Hopfer claims that upon delivery her newborn daughter had the umbilical cord wrapped tightly around her neck and that Hopfer could not remove the cord. Hopfer further claims that her daughter was not moving or breathing after the delivery and had an ashen or grey complexion.

Soon after the delivery, Hopfer wrapped her daughter in two towels and then took a shower. Hopfer's mother arrived home from the ice cream social around 7:15 p.m. and took a shower in a separate bathroom. While her mother showered, Hopfer placed her daughter, still wrapped in the towels, in two plastic garbage bags, which she then knotted, carried the bags into the garage, and put them in a trash can. The garbage bags containing her baby remained in the trash can for four days until the trash was picked up by the local hauling service.

Hopfer spent the remainder of August 14, 1994, watching television with her mother without mentioning the delivery of her baby. The next morning, Hopfer attended band practice and continued with her regular daily routine for the rest of the week.

On August 16, 1994, Hopfer called Hanaghan and told her about the delivery of her daughter. Hanaghan testified that Hopfer told her during this telephone call that the baby had been crying after the delivery and had continued to cry, even after Hopfer had placed the baby, wrapped in towels and two plastic garbage bags, in the trash can. Hanaghan further testified that Hopfer said during the telephone call that she had killed her baby and was now a "murderer."

After speaking with Hopfer, Hanaghan told her boyfriend about the conversation. On August 18, 1994, Hanaghan's boyfriend contacted the Centerville Police Department and reported the incident. After determining that Hopfer did not live within its jurisdiction, the Centerville police contacted the Washington Township Sheriff's Department, which then conducted an investigation. After taking Hanaghan's and her boyfriend's statements, sheriff's deputies went to Hopfer's residence to speak with her.

While at Hopfer's residence, the sheriff's deputies asked Hopfer about her pregnancy and the delivery of her baby. After initially denying the incident, Hopfer ultimately admitted to having delivered a baby girl and having disposed of it in the trash. Hopfer wrote and signed a statement in which she described the details of the delivery and the disposal of her daughter. In the last sentence of her statement, Hopfer admitted that her baby cried and moved after being placed in the two plastic garbage bags. Hopfer's mother provided the sheriff's deputies with the name of her waste disposal service, and efforts were made to retrieve the baby's body. On August 19, 1994, sheriff's deputies recovered the body of a newborn baby girl, wrapped in two towels and double-bagged, from the same garbage truck that collected Hopfer's trash.

On August 22, 1994, Hopfer appeared at the Montgomery County Sheriff's Office, where she was arrested and taken to the juvenile detention center. On August 24, 1994, Hopfer was charged with murder in violation of R.C. 2903.02 by complaint filed in the Juvenile Division of the Common Pleas Court of Montgomery County, Ohio. The state asked the juvenile court to relinquish jurisdiction pursuant to Juv.R. 30(A). The juvenile court held separate probable cause and amenability hearings and, on November 17, 1994, ordered the case transferred to the Criminal Division of the Common Pleas Court of Montgomery County, Ohio, pursuant to Juv.R. 30 and R.C. 2151.26. On December 14, 1994, Hopfer was indicted for murder and gross abuse of a corpse. Following a jury trial, Hopfer was convicted of both counts and was sentenced to imprisonment for fifteen years

to life for murder, concurrent with an eighteen-month term for gross abuse of a corpse.

From her conviction and sentence, Hopfer appeals.

## II

Hopfer's First Assignment of Error is as follows:

"The juvenile court abused its discretion in transferring jurisdiction to the common pleas court."

Hopfer contends that she was amenable to treatment and rehabilitation within the juvenile court system and that the juvenile court abused its discretion when it permitted the state to prosecute her as an adult. In considering this argument, we must emphasize that the test is not whether we would have reached the same result based upon the evidence in the record, but whether the juvenile court abused the substantial discretion confided in it by the Ohio General Assembly.

Hopfer asserts that her above-average intelligence, excellent academic record, prior untarnished juvenile record, stable family life, and generally nonviolent character weighed heavily in favor of keeping her within the juvenile court system. Moreover, Hopfer maintains that she felt a great deal of self-reproach regarding the death of her daughter and wished to participate in psychological treatment—factors that suggested her amenability to care and rehabilitation. Finally, Hopfer contends that she was not a threat to society and that incarceration beyond her twenty-first birthday was not required to protect the community.

At the juvenile court's amenability hearing, Hopfer introduced the expert testimony of a psychiatrist, Dr. Douglas Mossman, who conducted several interviews with Hopfer while she was in the juvenile detention center. Based upon these interviews and discussions with Hopfer's parents, Mossman concluded that Hopfer was suffering from a psychiatric disorder at the time she committed the alleged crimes and that the disorder was treatable. Further, Mossman testified that Hopfer posed no significant threat to the community and was amenable to rehabilitation.

In contrast, the court-appointed experts, two psychologists, Dr. Laura Fujimura and Dr. Thomas O. Martin, concluded that Hopfer was not remorseful over the death of her baby and posed a threat to the community because she was willing to transgress social boundaries to accomplish her goals. Fujimura, who conducted interviews and psychological and personality tests with Hopfer, testified that Hopfer had no internal sense of right or wrong, but made her decisions to conform with the perceived expectations of others. Fujimura also testified that Hopfer often blamed others, like her friend Hanaghan, for her predicament instead of taking responsibility for her own actions. In sum, Fujimura and

Martin concluded that Hopfer posed a threat to the community and was not amenable to treatment and rehabilitation.

In deciding whether to relinquish its jurisdiction, the juvenile court enjoys a wide latitude of discretion. *State v. Carmichael* (1973), 35 Ohio St.2d 1, 64 O.O.2d 1, 298 N.E.2d 568, paragraph one of the syllabus. In reviewing the juvenile court's decision to permit the state to prosecute Hopfer as an adult, the test is not whether we would have reached the same result upon the evidence before the juvenile court; the test is whether the juvenile court abused the discretion confided in it. As the Supreme Court of Ohio has held, "[t]he term 'abuse of discretion' connotes more than an error of law or of judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *State v. Adams* (1980), 62 Ohio St.2d 151, 157, 16 O.O.3d 169, 173, 404 N.E.2d 144, 148. Accordingly, we must review the juvenile court's decision to determine whether it was unreasonable (that is, without *any* reasonable basis), arbitrary, or unconscionable.

Juv.R. 30 permits the juvenile court to transfer jurisdiction where there are reasonable grounds to believe that the child is not amenable to care or rehabilitation in the juvenile penal system and where the safety of the community may require the child to remain incarcerated beyond the child's twenty-first birthday. Juv.R. 30(D); see R.C. 2151.26. The juvenile court must consider the following circumstances in determining the child's amenability to care or rehabilitation within the juvenile penal system:

"(1) The child's age and mental and physical condition;

"(2) The child's prior juvenile record;

"(3) Efforts previously made to treat or rehabilitate the child;

"(4) The child's family environment;

"(5) The child's school record;

"(6) The specific facts relating to the offense for which probable cause was found, to the extent relevant to the child's physical or mental condition." Juv.R. 30(F).

When considering these six circumstances, the juvenile court need not find that any of the circumstances specifically weighs against the juvenile as long as the "totality of the evidence supports a finding that the juvenile is not amenable to treatment." *State v. Watson* (1989), 47 Ohio St.3d 93, 95, 547 N.E.2d 1181, 1184; see *State v. Campbell* (1991), 74 Ohio App.3d 352, 356–357, 598 N.E.2d 1244, 1247; *State v. Oviedo* (1982), 5 Ohio App.3d 168, 171, 5 OBR 351, 355, 450 N.E.2d 700, 705. As the Supreme Court of Ohio has noted:

"Rule 30 calls for a broad assessment of individual circumstances. Mechanical application of a rigidly defined test would not serve the purposes of the public or the juvenile. Further, reduction of the bindover decision to a formula would constrain desirable judicial discretion." *Watson,* 47 Ohio St.3d at 95, 547 N.E.2d at 1184.

In this broad assessment, any one particular circumstance may carry more weight than other circumstances. For example, the seriousness of the alleged act may speak not only to a child's mental health, but also to her threat to the community and to her need for rehabilitation beyond her twenty-first birthday. See *id.* at 96, 547 N.E.2d at 1184. In sum, any evidence that reasonably supports the juvenile court's decision to relinquish jurisdiction will suffice to sustain that court's judgment.

From our review of the record, we cannot say that the juvenile court abused its discretion when it decided to relinquish jurisdiction and permit the state to prosecute Hopfer as an adult. Fujimura, the expert called by the state, provided sufficient testimony with respect to Hopfer's lack of remorse and skewed value system to conclude that she would not be amenable to rehabilitation or treatment within the juvenile penal system. Moreover, Hopfer's age at the time of the hearing, only three months short of eighteen, weighed against retaining jurisdiction. Further, the nature and severity of the alleged act suggested a callous indifference to human life, which could pose a threat to the community even beyond Hopfer's twenty-first birthday. This callous indifference is consistent with Fujimura's mental profile of Hopfer as being self-focused to the exclusion of other's rights and privileges. Based upon these circumstances, the juvenile court did not abuse its discretion by relinquishing its jurisdiction over Hopfer.

With respect to Hopfer's contentions, we recognize that there were many factors that weighed in favor of the juvenile court retaining jurisdiction. Hopfer's excellent academic record, lack of criminal history, clean disciplinary record, and previously stable family life spoke in favor of her potential for rehabilitation. We also recognize that the immaturity and irresponsibility expressed in her crime speak volumes on the social dilemma of "children having children." Yet, we cannot say, after reviewing the record, that the juvenile court's decision to relinquish jurisdiction was unreasonable, arbitrary, or unconscionable.

Accordingly, Hopfer's First Assignment of Error is overruled.

### III

Hopfer's Second Assignment of Error is as follows:

"The court committed numerous acts of judicial misconduct which cumulatively prejudiced defendant's right to due process of law and a fair trial."

Hopfer maintains that various comments made by the trial court during her trial were improper and prejudiced the jury against her. Such comments included references to previous evidentiary hearings, suggestions that certain testimony was irrelevant, remarks that implied impatience with Hopfer's attorneys, and other inappropriate statements. Moreover, Hopfer claims that the trial court expressed its opinion to the jury that Hopfer made statements about her daughter crying and moving at birth and that such statements amounted to "admissions and confessions."

■ As a general rule, a trial court must avoid expressing any opinion to the jury concerning the probative value of evidence or the credibility of any particular witness.

"In a trial before a jury, the court's participation by questioning or comment must be scrupulously limited, lest the court, consciously or unconsciously, indicate to the jury its opinion on the evidence or on the credibility of a witness." *State ex rel. Wise v. Chand* (1970), 21 Ohio St.2d 113, 119, 50 O.O.2d 322, 325, 256 N.E.2d 613, 617; see *State v. Nutter* (1970), 22 Ohio St.2d 116, 119, 51 O.O.2d 178, 180, 258 N.E.2d 440, 443; *State v. Sutton* (1966), 7 Ohio App.2d 178, 180, 36 O.O.2d 313, 314, 219 N.E.2d 307, 308.

In order to determine whether a trial court's remarks are prejudicial, the Supreme Court of Ohio has set forth the following guidelines:

"(1) The burden of proof is placed upon the defendant to demonstrate prejudice, (2) it is presumed that the trial judge is in the best position to decide when a breach is committed and what corrective measures are called for, (3) the remarks are to be considered in light of the circumstances under which they are made, (4) consideration is to be given to their possible effect upon the jury, and (5) to their possible impairment of the effectiveness of counsel." *State v. Wade* (1978), 53 Ohio St.2d 182, 188, 7 O.O.3d 362, 365, 373 N.E.2d 1244, 1248.

As a threshold matter, Hopfer must preserve any error by the trial court for appeal:

"The failure to object has been held to constitute a waiver of the error and to preclude its consideration upon appeal, for, absent an objection, the trial judge is denied an opportunity to give corrective instructions as to the error." *Id.*

■ After reviewing the trial court's numerous comments, we observe that only one comment—the "admissions and confessions" comment—was objected to by Hopfer's counsel at trial. With respect to the other various comments identified by Hopfer, we conclude that Hopfer's failure to object to these

comments at trial constituted a waiver of her right to appeal any error resulting from them. Further, we note that almost all of these various comments were related to the clarification or control of evidentiary matters, that is, related to the form and relevance of a question, the responsiveness of the witness, or the admissibility of extraneous testimony and evidence. Such comments did not suggest to the jury the prejudices or passions of the trial court but, rather, they were related to the trial court's attempts to manage the flow of testimony into the record. In short, even if Hopfer had objected to these various comments at trial, we would have interpreted them as innocuous and dismissed them on appeal.

The colloquy, previously identified as the "admissions and confessions" comment, is set forth as follows:

"COUNSEL: And were you surprised to learn, we talked, that the defendant had made admission and confessed that the baby was alive and crying at the time of birth?

"MR. MONTA: I'm going to object to the term admissions and confessions. We don't find statements.

"THE COURT: *Sounded like that to me.*

"MR. MONTA: Judge, please, we object to the characterization of the court, please.

"THE COURT: I don't—I don't see that it's objectionable. I'll overrule the objection. Go ahead. Hate to interrupt his presentation." (Emphasis added.)

Later in the trial, Hopfer moved for a mistrial based upon the trial court's purportedly prejudicial statement. The trial court denied the motion, but agreed to give the jury a cautionary instruction at the end of the trial to ignore any of its comments that might have reflected its view of the facts.

▮▮▮▮ With respect to the *Wade* guidelines, we find that the trial court's comment, agreeing with the characterization of Hopfer's statements as "admissions and confessions," could not have been misunderstood by a reasonable jury to prejudice Hopfer's right to a fair trial or have impaired the effectiveness of Hopfer's counsel. See 53 Ohio St.2d at 189, 7 O.O.3d at 366, 373 N.E.2d at 1249. Earlier in the trial, several witnesses testified that Hopfer told them that her baby was crying and moving after birth. Such statements clearly satisfied the definition of an "admission," which includes any statement made by a party in his individual capacity and offered against that party at trial. Evid.R. 801. We do recognize, however, that Hopfer's statements on this particular matter would not have constituted a "confession" because they did not address her guilt of the alleged crime. See *State v. Klumpp* (App.1960), 15 O.O.2d 461, 464, 175 N.E.2d 767, 771 (" 'A confession is an admission of the criminal act itself, not an

admission of a fact or circumstance from which guilt may be inferred.'"). Yet, Hopfer, in her appeal, does not appear to object to the misapplication of the term "confession" but, rather, contends that she never made such statements and that the trial court's agreement with the state's characterization of such statements suggested to the jury that the trial court believed that such statements actually took place and were made voluntarily.

In view of the context of the trial court's comment, we find that the trial court, in responding to Hopfer's initial objection, was merely recognizing that the state's characterization of Hopfer's "alleged" statements was reasonable in view of the prior testimony from the state's witnesses. The trial court did not suggest or imply to the jury that it personally believed that such statements, or any other statements, were actually made voluntarily by Hopfer. Rather, the trial court agreed that the state might fairly characterize Hopfer's alleged statements as "admissions and confessions." Also, we find that Hopfer has failed to demonstrate any prejudice resulting from either the state's characterization of Hopfer's statements or the trial court's agreement with that characterization. Moreover, the trial court's curative instruction to disregard any perceived expression of its opinion weighs against a finding of prejudice. See, e.g., State v. Loza (1994), 71 Ohio St.3d 61, 75, 641 N.E.2d 1082, 1100 (noting that a jury is presumed to follow instructions given by the trial judge). In short, Hopfer has not proven that the trial court's comments have prejudiced her right to a fair trial.

Hopfer's Second Assignment of Error is overruled.

## IV

Hopfer's Third Assignment of Error is as follows:

"Repeated instances of prosecutorial misconduct deprived defendant of due process and a fair trial."

Hopfer contends that the prosecutor made various comments that amounted to misconduct and prejudiced her right to a fair trial. Specifically, Hopfer claims that the prosecutor made various improper references to the juvenile court's decision to waive jurisdiction pursuant to the amenability hearing. Also, Hopfer claims that the prosecutor mischaracterized statements made by Hopfer for the purpose of prejudicing the jury against her. Finally, Hopfer claims that the prosecutor's overall pattern of behavior at the trial amounted to prosecutorial misconduct.

A misstatement by the prosecution mandates reversal of the verdict when the statement is improper and prejudices a substantial right of the accused. State v. Crago (1994), 93 Ohio App.3d 621, 644, 639 N.E.2d 801, 816, citing State v. Smith (1984), 14 Ohio St.3d 13, 14, 14 OBR 317, 318–319, 470 N.E.2d 883, 885.

Moreover, "[i]n general terms, the conduct of a prosecuting attorney during trial is not a ground for error unless that conduct deprives the defendant of a fair trial." *Loza,* 71 Ohio St.3d at 78, 641 N.E.2d at 1102.

 Hopfer contends that the prosecutor's reference to the result of the amenability hearing prejudiced the jury against her by suggesting that the juvenile court had bound her over only after finding evidence of her guilt for the crimes charged. Generally, the state is not permitted to refer to previous trials or hearings of the same cause of action for the same defendant. "[A]s a general rule, any reference at a new trial to the result of a former trial or hearing of the same cause is considered improper." *Jones v. Keller* (1966), 9 Ohio App.2d 210, 212, 38 O.O.2d 217, 219, 223 N.E.2d 657, 659. An amenability hearing, however, is not a hearing on the merits of an accusation of delinquency against a juvenile; instead, it is a factual determination of whether the accused is amenable to treatment and rehabilitation within the juvenile penal system. Consequently, reference to such a procedural hearing is not likely to prejudice the jury against the accused, and the general prohibition regarding reference to prior hearings and trials does not necessarily apply. Moreover, in the case before us, the prosecutor most often referred to the amenability hearing in voir dire to explain to potential jurors why the state was prosecuting Hopfer as an adult—an issue that, for at least one juror, was relevant to his partiality. On another occasion, the prosecutor referred to the amenability hearing to clarify a witness's comment that the sheriff's deputy called her before the "first trial." Finally, the prosecutor referred to the amenability hearing to establish a chronological order of events while cross-examining Hopfer. In light of the innocuous nature of these comments, along with the procedural nature of the amenability hearing itself, we conclude that the prosecutor's references to the amenability hearing were not improper and did not prejudice Hopfer's right to a fair trial.

 Hopfer also maintains that the prosecutor mischaracterized statements made by her as being "admissions and confessions" and that this mischaracterization prejudiced the jury against her and denied her a fair trial. As we have discussed in response to the Second Assignment of Error, any statement made by Hopfer would constitute an "admission" as defined by Evid.R. 801, and the prosecutor's characterization of these statements as "admissions" is neither misleading nor otherwise prejudicial to her. Further, Hopfer did make an alleged "confession" when she told Hanaghan that she had "killed" the baby and that she was now a "murderer." Cf. *Klumpp,* 15 O.O.2d at 464, 175 N.E.2d at 771. On only one occasion cited by Hopfer did the prosecutor use the term "confession" with respect to a statement made by her relating only to a specific fact regarding her baby's death and not to her guilt of the crimes charged. However, the prosecutor's misapplication of the term "confession" did not rise to

the level of misconduct necessary to deprive Hopfer of a fair trial.[1] Accordingly, we cannot conclude that the conduct of the prosecutor prejudiced Hopfer's substantive rights.

Hopfer's Third Assignment of Error is overruled.

V

Hopfer's Fourth Assignment of Error is as follows:

"The trial court committed error by not permitting a complete view of the scene after the prosecution barred jurors from viewing part of the scene requested by the defense."

Hopfer argues that the trial court abused its discretion by not permitting jurors to view her bedroom after they viewed the rest of her residence. Hopfer claims that the jury must have noticed that her bedroom was closed off while the other rooms were accessible, and, consequently, the jury must have viewed Hopfer and her counsel with distrust, presumably for hiding something from their view. Also, Hopfer maintains that a view of her bedroom was relevant to the case because she testified that she spent parts of her day on August 14, 1994 lying on her bed and running to the bathroom across the hall.

On June 2, 1995, Hopfer filed a motion to permit the jury to view her residence in Washington Township, Ohio. On June 5, 1995, the state filed a similar motion requesting that the jury view Hopfer's residence and the tipping floor of the incinerator where the sheriff's deputies found the body of the newborn baby girl. In response to the motions, the trial court ordered the jury to view Hopfer's residence and the incinerator tipping floor. The state claims that, prior to the jury view, there was a "gentleman's agreement" that the jury would not view Hopfer's bedroom. Hopfer denies that such an agreement existed, and the record does not reflect the trial court's acknowledgment of any prior agreement. Regardless, the state, while at Hopfer's residence, refused to permit the jury to view Hopfer's bedroom because it had "more teddy bears than Toys–R–Us," and the state feared that such a scene would prejudice the jury. Hopfer's counsel attempted to contact the trial court to resolve the matter, but without success. On June 13, 1995, both parties appeared before the trial court, which concluded

---

1. In determining whether Hopfer received a fair trial, we must review the prosecutor's misstatement in light of the totality of the evidence presented at trial. "If it is clear beyond a reasonable doubt that, absent the prosecutor's comments, the jury would have found appellant guilty, then his conviction will not be reversed." *Loza*, 71 Ohio St.3d at 78, 641 N.E.2d at 1102, citing *State v. Smith* (1984), 14 Ohio St.3d 13, 14 OBR 317, 470 N.E.2d 883. There is no indication from either Hopfer or the record that the prosecutor's characterization of her statement as a "confession," rather than just an "admission," would have changed the jury's perception of the evidence or otherwise influenced the jury's verdict.

that a view of Hopfer's bedroom was not necessary at that time. However, the trial court acknowledged that a view of Hopfer's bedroom could become necessary if the testimony at trial made the matter relevant to the material issues of the case.

The relevant statute pertaining to a jury view reads as follows:

"When it is proper for the jurors to have a view of the place at which a material fact occurred, the trial court may order them to be conducted in a body, under the charge of the sheriff or other officer, to such place, which shall be shown to them by a person designated by the court." R.C. 2945.16.

The trial court may permit more than one jury view of the crime scene. *State v. Watson* (1991), 61 Ohio St.3d 1, 11, 572 N.E.2d 97, 106. Moreover, a view of a crime scene is not considered evidence, nor is it a crucial step in the criminal proceedings. *State v. Richey* (1992), 64 Ohio St.3d 353, 367, 595 N.E.2d 915, 927; see *State v. Smith* (1993), 90 Ohio App.3d 177, 180, 628 N.E.2d 120, 121. The trial court has broad discretion in determining whether to authorize a view of the crime scene. *Richey* at 367, 595 N.E.2d at 927, citing *State v. Zuern* (1987), 32 Ohio St.3d 56, 58, 512 N.E.2d 585, 588.

From our review of the record, we conclude that the trial court did not abuse its discretion by forgoing a jury view of Hopfer's bedroom pending further testimony at trial. Hopfer's testimony regarding her bedroom was, at best, ancillary to the material facts of the case. Moreover, the alleged prejudice against Hopfer, the mistrust of the jury toward her counsel, is based solely upon speculation and not upon any discernible fact in the record. Further, no aspect of Hopfer's defense depended on anything physically present in her bedroom. See 32 Ohio St.3d at 58, 512 N.E.2d at 588. Accordingly, we conclude that the trial court did not abuse its discretion by refusing Hopfer's request for a jury view of her bedroom.

Hopfer's Fourth Assignment of Error is overruled.

## VI

Hopfer's Fifth Assignment of Error is as follows:

"The court abused its discretion in refusing to examine juror Zartman regarding a potential instance of juror misconduct."

Hopfer contends that the trial court erred by refusing to conduct a voir dire, *in camera* examination of Juror Zartman after an anonymous caller informed the court and Hopfer's counsel that the caller's wife had heard from Zartman's mother that Zartman allegedly made a comment to her either before or during the trial that she wanted to have a baby. Hopfer claims that this alleged

comment, along with the anonymous caller's suggestion that Zartman might be hostile toward Hopfer, mandated further investigation by the trial court.

 In reviewing circumstances suggesting juror misconduct, we must employ a two-tier analysis: (1) determine whether there was juror misconduct and (2) if juror misconduct is found, determine whether it materially affected the defendant's substantial rights. See *State v. Taylor* (1991), 73 Ohio App.3d 827, 833, 598 N.E.2d 818, 821.

One form of juror misconduct is bias or prejudice, that is, a refusal to consider the evidence or a forming of an opinion of guilt or innocence before all of the evidence is presented. *Id.* at 831, 598 N.E.2d at 820. This court has set forth a test to determine whether a juror's bias amounts to misconduct.

"The test for a prospective juror is not whether he has escaped normal influences or has no views on a universal question; the test is whether his views will impair his judgment to the extent that he would not be able to faithfully and impartially determine the facts and apply the law according to the instructions of the court." *Dayton v. Gigandet* (1992), 83 Ohio App.3d 886, 891–892, 615 N.E.2d 1131, 1134.

 In the case before us, we find nothing in Zartman's alleged statement to warrant a voir dire examination. Taken at face value, the alleged statement suggests nothing about the juror's opinion for or against Hopfer. Zartman's private conversation with her mother regarding her desire to have children does not reflect on her ability fairly to determine whether Hopfer murdered her baby. Although Hopfer interprets the alleged statement as indicating bias, it is entirely possible that the facts of this case, Hopfer's pregnancy, delivery, and subsequent disposal of her baby, may have prompted Zartman to reflect upon her own life and maternal needs and to communicate her thoughts to her mother. Such communication does not fall within the realm of juror misconduct.

As for the anonymous caller's interpretation of Zartman's alleged statement, the trial court need not act upon the speculation of unknown individuals or investigate their suspicions. The anonymous caller provided no specific indication of Zartman's bias or partiality, but rather, relayed his "impression" of the alleged statement, which he had heard from his wife, who had spoken with Zartman's mother. Such conjecture does not overcome Zartman's assurance to the trial court that she would remain an impartial juror. Furthermore, the trial court remained willing to reconsider its decision if further facts arose regarding Zartman's alleged bias. Accordingly, we conclude that the trial court did not err by forgoing a voir dire examination of Zartman in response to the anonymous caller.

Hopfer's Fifth Assignment of Error is overruled.

## VII

Hopfer's Sixth Assignment of Error is as follows:

"The trial court erred by overruling defendant's motions to suppress statements and search evidence. The trial court also erred by overruling defendant's motion *in limine* to restrict cross-examination of defendant to police interrogation."

Hopfer argues that her questioning by the sheriff's deputies on August 18, 1994 amounted to a custodial interrogation and that the failure of the sheriff's deputies to read Hopfer her *Miranda* rights rendered her subsequent statements involuntary and inadmissible at trial. Hopfer also contends that even if the questioning did not amount to a custodial interrogation, her statements were not voluntary but, rather, were coerced by the sheriff's deputies. Finally, Hopfer argues that the trial court prevented her from testifying at a suppression hearing by overruling her motion *in limine* and permitting the state to cross-examine her on any subject relevant to her alleged crimes.

On May 17, 1995, the trial court conducted a hearing to rule on Hopfer's motion to suppress statements made by Hopfer to sheriff's deputies on August 18, 1994. During the hearing, three sheriff's deputies testified that they arrived at Hopfer's residence in plain clothes and driving unmarked cars around 10:30 p.m. They were invited into the house by Hopfer's mother, Mrs. Hopfer, and conducted to the living room. While her mother was in the adjoining kitchen, Hopfer ultimately admitted to delivering and disposing of her baby in the trash while it was still alive. Upon a sheriff's deputy's request, Hopfer, while alone in the kitchen, drafted a written statement in which she admitted to delivering a baby girl and placing it in the trash. One of the sheriff's deputies read the statement and asked Hopfer about her previous statement that the baby was alive and crying. In response to the question, Hopfer added the last sentence to her statement that "[a]fter the baby was born, she did cry + she was still moving once I put her in the bag." Mrs. Hopfer volunteered to provide the sheriff's deputies with information about her trash collection service so that they could locate the baby. The sheriff's deputies testified that they conducted themselves in a calm and professional manner all evening, that they were never asked to leave the Hopfer residence, that neither Hopfer nor her mother ever refused to speak with them, and that Hopfer never asked to take a break for any reason. Further, the sheriff's deputies testified that they never intended to arrest Hopfer at any time that evening. The sheriff's deputies admitted that they never gave Hopfer her *Miranda* warnings.

Mrs. Hopfer's testimony regarding the events on August 18, 1994 varied somewhat from the sheriff's deputies' testimony. Mrs. Hopfer testified that the

sheriff's deputies "pounded" on her door at around 10:30 that evening. A sheriff's deputy introduced himself in a tone of voice that was harsh and direct, and she felt that she had no choice but to follow his directions. Mrs. Hopfer and her daughter were then escorted to the living room where the sheriff's deputies repeatedly questioned Hopfer about her baby. After Hopfer's initial denials, Mrs. Hopfer was directed to leave the living room and go into the kitchen with one of the sheriff's deputies. Although she could hear voices from the living room, Mrs. Hopfer could not determine what was being said to her daughter. When she returned to the living room, the sheriff's deputies ordered Hopfer to tell her what happened, and Hopfer admitted to having had a baby, but did not admit to having killed the baby. Mrs. Hopfer testified that a sheriff's deputy told her daughter that she should cooperate with them because she would only get probation. Mrs. Hopfer further testified that after one sheriff's deputy read her daughter's written statement, he told her daughter, in a "you-have-no-choice" voice, to add a sentence that said the baby was alive after the delivery or else she would get "no mercy." However, Mrs. Hopfer admitted that she never informed the sheriff's deputies that she felt she had "no choice" but to follow their directions, or that she did not want them to speak with her daughter, or that she did not want them in her home.

During the hearing, Hopfer requested a motion *in limine* to limit the scope of the state's cross-examination of her after she testified in support of the motion to suppress. Hopfer wanted the trial court to limit the state's cross-examination to the events that occurred on August 18, 1994, and not permit cross-examination of any other events related to the alleged crimes. The trial court denied Hopfer's motion *in limine* and informed her that the state might inquire into any aspect of the alleged crime that was relevant to the case, although such testimony could not be used against her at trial unless it was for impeachment purposes. Based upon the trial court's decision, Hopfer chose not to testify at the hearing.

We will first address the issue of whether the sheriff's deputies' questioning of Hopfer on August 18, 1994, amounted to a custodial interrogation and, consequently, required *Miranda* warnings. The United States Supreme Court in *Miranda v. Arizona* (1966), 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694, 706, defined a custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Custodial interrogation is measured by an objective standard, not by the subjective understanding of the suspect.

"A policeman's unarticulated plan has no bearing on the question whether a suspect was "in custody" at a particular time; the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation."

*Berkemer v. McCarty* (1984), 468 U.S. 420, 442, 104 S.Ct. 3138, 3151, 82 L.Ed.2d 317, 336.

Accordingly, we must determine whether a reasonable person in Hopfer's position would have believed that she was not free to leave the presence of the sheriff's deputies and forgo further questioning.

After reviewing the record, we conclude that a reasonable person in Hopfer's position would have believed that she could have left the presence of the sheriff's deputies. The sheriff's deputies arrived at the Hopfer residence at 10:30 p.m., which was not an unreasonable hour considering the seriousness of the alleged crime. They were invited inside by Mrs. Hopfer after announcing the purpose of their visit and were never asked to leave afterwards. When they spoke with Hopfer, her mother was either by her side or in the adjoining room, fully aware that her daughter was being questioned. Neither Hopfer nor her mother ever expressed a desire not to cooperate with the sheriff's deputies. The sheriff's deputies did not search the house, nor did they ask for a "tour" or any other view of the home. There is no indication that Hopfer was not permitted to return to her upstairs bedroom alone or otherwise leave the living room to some other part of the house without being followed by a sheriff's deputy. Most important, the sheriff's deputies never expressed any intention to arrest Hopfer, and left the Hopfers' residence without doing so.

If, as Mrs. Hopfer contends, she believed that she and Hopfer had no choice but to cooperate with the sheriff's deputies, that belief was objectively unreasonable. The mere presence of police officers does not render a suspect powerless, particularly when the suspect is within the familiar surroundings of her own home. Hopfer cites *Orozco v. Texas* (1968), 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311, for the proposition that questioning by the police within one's home may constitute a custodial interrogation. While we agree with this general proposition, we also note that the defendant in *Orozco* was questioned at 4:00 a.m. in his bedroom by four police officers who were let inside by an unidentified woman at his boarding house and who believed that the defendant was, at that time, under arrest. The circumstances surrounding Hopfer's questioning do not show the same pervasion of police authority as was evident in *Orozco*. Accordingly, we conclude that a reasonable person in Hopfer's position would have understood that she had the freedom to walk away from the questioning of the sheriff's deputies or to otherwise cease cooperating with their investigation.

With respect to Hopfer's motion *in limine*, we find that the trial court properly denied the motion as a matter of law. Hopfer's argument regarding the scope of cross-examination at the motion to suppress hearing is very similar to

the argument presented to the Supreme Court of Ohio in *State v. Campbell* (1994), 69 Ohio St.3d 38, 44, 630 N.E.2d 339, 347:

"Campbell, however, argues that withdrawing the motion should not be deemed a waiver, because the trial court illegally forced him to choose between two constitutional rights. When Campbell testified at the suppression hearing, the prosecutor asked him whether he was near Turner's residence on the night of December 23. Defense counsel objected, but the trial court overruled the objection. Only then did defense counsel withdraw the motion.

"Campbell argues that the trial court, by overruling his objection, forced him to withdraw the motion in order to avoid self-incrimination. We disagree. Answering the prosecutor's question could not have incriminated Campbell, because 'when a defendant testifies in support of a motion to suppress evidence on Fourth Amendment grounds, his testimony may not thereafter be admitted against him at trial on the issue of guilt * * *.' *Simmons v. United States* (1968), 390 U.S. 377, 394, 88 S.Ct. 967, 976, 19 L.Ed.2d 1247, 1259."

The trial court correctly explained to Hopfer that the state could not use her testimony from the motion to suppress hearing at her trial, except for the purposes of impeachment. Therefore, Hopfer's decision not to testify at the suppression hearing was, presumably, a strategic one, and she cannot now fault the trial court for the consequences of that decision.

 Hopfer's final contention is that her August 18, 1994 statements were not voluntary but, rather, the product of police coercion. As a threshold matter, "coercive police activity is a necessary predicate to finding that a confession is not voluntary within the Fifth Amendment, on which *Miranda* was based." *State v. Dailey* (1990), 53 Ohio St.3d 88, 91–92, 559 N.E.2d 459, 463, citing *Colorado v. Connelly* (1986), 479 U.S. 157, 170, 107 S.Ct. 515, 523, 93 L.Ed.2d 473, 486. Without police coercion, circumstances such as the defendant's minority or low I.Q. do not negate the voluntariness of the confession. *Dailey* at 92, 559 N.E.2d at 463. In deciding whether Hopfer's confession was involuntary, "the court should consider the *totality* of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement." (Emphasis *sic.*) *State v. Edwards* (1976), 49 Ohio St.2d 31, 40–41, 3 O.O.3d 18, 23, 358 N.E.2d 1051, 1059, citing *Brown v. United States* (C.A.10, 1966), 356 F.2d 230, 232. Promises of leniency by the police, such as probation upon conviction, are improper and render an ensuing confession involuntary. *State v. Arrington* (1984), 14 Ohio App.3d 111, 116, 14 OBR 125, 130–131, 470 N.E.2d 211, 216–217. However, "admonitions to tell the truth directed at a suspect by police officers are not coercive in nature." *State v.*

*Wiles* (1991), 59 Ohio St.3d 71, 81, 571 N.E.2d 97, 112, citing *State v. Cooey* (1989), 46 Ohio St.3d 20, 28, 544 N.E.2d 895, 908.

In the case before us, the totality of the circumstances suggests that the sheriff's deputies' questioning of Hopfer was not coercive. On August 18, 1994, Hopfer was an above-average high school student, in good health, and only three months shy of her eighteenth birthday. She was questioned in the familiar surroundings of her own home with her mother either by her side or within earshot. The questioning took less than two hours, and the sheriff's deputies questioned Hopfer in either the living room or kitchen, areas of a house often accessible to visitors and guests.

Mrs. Hopfer contends that one sheriff's deputy made an explicit promise—Hopfer would get probation if she cooperated by writing a statement—and an explicit threat—Hopfer would get "no mercy" unless she added an incriminating sentence to her written statement. While such promises and threats are improper, both of these allegations were denied by the three sheriff's deputies in their testimony. The trial court, in denying Hopfer's motion to suppress, chose to find the sheriff's deputies' testimony more credible than the testimony of Hopfer's mother. The factual findings of the trial court are given great deference:

"In a hearing on a motion to suppress evidence, the trial court assumes the role of trier of facts and is in the best position to resolve questions of fact and evaluate the credibility of witnesses." *State v. Venham* (1994), 96 Ohio App.3d 649, 653, 645 N.E.2d 831, 833.

Accordingly, we conclude that the totality of the circumstances suggests that Hopfer's free will was not overcome by the coercive behavior of the sheriff's deputies and that Hopfer's statements were voluntary and admissible at trial. Cf. *State v. Johnston* (1990), 64 Ohio App.3d 238, 245, 580 N.E.2d 1162, 1167.

Hopfer's Sixth Assignment of Error is overruled.

## VIII

Hopfer's Seventh Assignment of Error is as follows:

"The court erred in refusing repeated defense requests for a witness grand jury transcript and by permitting the prosecutor to use said transcript to impeach the defense witness."

Hopfer contends that the trial court improperly refused to allow her to discover specific portions of the grand jury testimony relating to her case. Hopfer argues that she needed the grand jury testimony of her expert witness, Dr. Kevin Bove, before her trial to prevent Bove from contradicting his previous testimony as a

grand jury witness. Further, Hopfer maintains that she was entitled to view Bove's grand jury testimony when the state impeached Bove's credibility with that same testimony at trial.

On June 2, 1995, Hopfer filed a motion requesting Bove's grand jury testimony to refresh Bove's recollection of his previous testimony and, purportedly, to prevent his inconsistent testimony at trial. The trial court denied Hopfer's motion, stating that the interest in maintaining the secrecy of the grand jury testimony outweighed Hopfer's interest in preventing Bove from making inconsistent statements at trial. During the trial, the state used Bove's prior grand jury testimony to impeach him on an inconsistent statement regarding the inflation of the baby's lungs after delivery. Hopfer renewed her request for Bove's grand jury testimony under the auspices of Crim.R. 16(B)(1)(g) and Evid.R. 613. The trial court again denied Hopfer's request and noted that her initial motion requesting the grand jury testimony was not timely filed.

Testimony before the grand jury is secret and may only be disclosed upon the direction of the trial court. Crim.R. 6(E). Crim.R. 16(B)(1)(g) is not applicable to a defendant's request for disclosure of a witness's grand jury transcript. *State v. Greer* (1981), 66 Ohio St.2d 139, 149, 20 O.O.3d 157, 163–164, 420 N.E.2d 982, 988–989. Instead, the defendant may elicit the grand jury testimony of a witness only upon a showing of a particularized need for the testimony.

"Whether particularized need for disclosure of grand jury testimony is shown is a question of fact; but, generally, it is shown where from a consideration of all the surrounding circumstances it is probable that the failure to disclose the testimony will deprive the defendant of a fair adjudication of the allegations placed in issue by the witness' trial testimony." *Id.* at paragraph three of the syllabus.

Upon a proper motion, the trial court will consider the defendant's particularized need for grand jury testimony, although the trial court may exercise its own discretion to determine whether the defendant's particularized need for production meets with its satisfaction. *Id.* at 148–150, 20 O.O.3d at 162–164, 420 N.E.2d at 987–989.

The trial court properly denied Hopfer's request for Bove's grand jury testimony because the motion was untimely, and it failed to set forth a particularized need for production that, if not met, would deprive Hopfer of a fair trial.

Hopfer's motion was filed on June 2, 1995, only ten days prior to her trial. Crim.R. 12(C) states that pretrial motions, with some specified exceptions, must be filed within thirty-five days after arraignment or seven days before trial, whichever date is earlier. Hopfer was arraigned on December 22, 1994, so her

motion requesting Bove's grand jury testimony should have been filed by January 26, 1995. Accordingly, Hopfer's motion was untimely.

Even if the motion was timely filed, the trial court properly found that Hopfer failed to set forth a particularized need that compelled disclosure of Bove's grand jury testimony. Hopfer's stated particularized need was to permit Bove to read his grand jury testimony so that he could avoid making inconsistent statements at trial. Such a broad use of the grand jury testimony does not suggest the "particularized" need required for disclosure. Indeed, Hopfer's intended use of Bove's grand jury testimony, that is, to prepare her witness for trial, could apply in any case with any witness who previously testified before a grand jury. Cf. *State v. Webb* (1994), 70 Ohio St.3d 325, 337, 638 N.E.2d 1023, 1034. Such an expansive interpretation of a particularized need would render Crim.R. 6(E) ineffective.[2] In short, the trial court's decision to deny Hopfer's motion requesting Bove's grand jury testimony was not an abuse of its discretion because Hopfer failed to show that nondisclosure of that testimony would "probably" deprive her of a fair trial. See *id.*

Hopfer also argues that the impeachment of Bove by the state during trial mandated the disclosure of Bove's grand jury transcript pursuant to Crim.R. 16(B)(1)(g) and Evid.R. 613. As we have already noted, Crim.R. 16(B)(1)(g) is not applicable to a defendant's request for grand jury testimony. See *Greer*, 66 Ohio St.2d at 149, 20 O.O.3d at 163–164, 420 N.E.2d at 988. In contrast, Evid.R. 613 was triggered by the state's impeachment of Bove using his prior grand jury testimony. Evid.R. 613(A) states:

"In examining a witness concerning a prior statement made by him, whether written or not, the statement need not be shown nor its contents disclosed to him at that time, but on request the same shall be shown or disclosed to opposing counsel."

Contrary to the state's suggestion, we will not interpret Evid.R. 613(A) to exclude all grand jury testimony from its reach. If the state chooses to impeach a defense witness with his grand jury testimony, then the defendant has a right, upon timely request, to view the relevant portions of the witness's grand jury testimony in order to confirm the alleged contradiction.

In the case before use, Hopfer requested the relevant portions of Bove's grand jury testimony after the state indicated its intent to impeach Bove on a contra-

---

2. Hopfer cites numerous federal cases that support the notion that courts should liberalize discovery of grand jury testimony by the defendant. However, Ohio has not shared this expansive view of discovery, and the parties in the case before us are bound by state law on this matter. See *Greer*, 66 Ohio St.2d at 148, 20 O.O.3d at 163, 420 N.E.2d at 988.

diction between his grand jury testimony and later statements. The state's impeachment of Bove was as follows:

"COUNSEL: Doctor, let me back up. In addition to the October 16th report that we had already referred to referencing the lungs, you've testified in the past, have you not, referencing the issue of whether the lungs were inflated or not based on your examination of the microscopy in this case?

"BOVE: Yeah.

"MR. MONTA: Objection.

"COURT: Overruled.

"COUNSEL: And, Doctor, you recall stating at that time that you didn't think that there was an expansion of the lungs based on your viewing of the microscopy?

"BOVE: Yes.

"COUNSEL: And do you also recall testifying that the baby, Baby Hopfer, in this case, was never able to successfully expand, you said 'his' lungs, but it would be her lungs?

"BOVE: Yes.

"COUNSEL: Is that correct?

"BOVE: Yes.

"COUNSEL: And that's different than what you told the ladies and gentlemen of the jury today?

"BOVE: It's different based on additional observations between when I made that statement and now."

Although the trial court erred by denying Hopfer's request for Bove's grand jury testimony, we find that the error was harmless beyond a reasonable doubt. See *State v. Lopez* (1993), 90 Ohio App.3d 566, 577, 630 N.E.2d 32, 39. After reviewing the record, we cannot say that the state's questions to Bove regarding his prior grand jury testimony were unfair or misleading. See *id.* In fact, Bove fully acknowledged that his testimony at trial contradicted his earlier testimony to the grand jury. More important, Bove's previous statements regarding the inflation of the baby's lungs after delivery had been repeated in an October 16, 1994 letter from Bove to Hopfer's counsel. Accordingly, Hopfer was aware of Bove's prior position on the issue and cannot now claim that she was "sandbagged" by his previous secret grand jury testimony, which contradicted his opinion at trial.

Hopfer's Seventh Assignment of Error is overruled.

## IX

Hopfer's Eighth Assignment of Error is as follows:

"The court erred in permitting the prosecutor to use defendant's privileged communications with her psychiatrist during his cross-examination of her."

Hopfer argues that the state improperly used privileged communications between her psychiatrist, Dr. Douglas Mossman, and herself to impeach her during cross-examination. Hopfer contends that Mossman's testimony from the juvenile court's amenability hearing was privileged and that she had never waived her privilege to permit the state to use his testimony at trial. Hopfer further argues that the state failed to lay a proper foundation before impeaching her with Mossman's testimony.

During the juvenile court's amenability hearing, Mossman testified that Hopfer told him that she told Hanaghan that her baby had been born alive. During trial, Hopfer testified on direct examination that she did not tell Hanaghan that her baby had been born alive. Hopfer, anticipating that the state would impeach her on the inconsistent statements, moved for a motion *in limine* to prevent the state from using Mossman's testimony at trial. The trial court denied Hopfer's motion and permitted the state to impeach Hopfer after laying a foundation regarding her understanding of the confidentiality of the mental examination. The state proceeded to impeach Hopfer without laying such a foundation.

The physician-patient privilege is a statutory privilege that states:

"The following persons shall not testify in certain respects:

" * * *

"(B)(1) A physician or a dentist concerning a communication made to him by his patient in that relation or his advice to his patient, except as otherwise provided in this division * * *." R.C. 2317.02.

A "communication" is defined as "acquiring, recording, or transmitting any information, in any manner, concerning any facts, opinions or statements necessary to enable a physician or dentist to diagnose, treat, prescribe, or act for a patient." R.C. 2317.02(B)(4)(a). Ohio courts have limited the scope of the physician-patient relationship to those in which the patient was seeking medical treatment or advice.

" * * * [S]ince the physician-patient privilege is in derogation of the common law, Ohio courts have strictly construed it to afford protection only to those relationships enumerated in the statute, meaning only to those instances in which medical treatment was sought." *Niemann v. Cooley* (1994), 93 Ohio App.3d 81, 93, 637 N.E.2d 943, 951.

Legal scholars recognize this same principle:

"The privilege accorded by R.C. § 2317.02(B) is available only to communications made within a physician-patient relationship. In view of the underlying purpose of fostering effective medical treatment, it is available only where a person consults a doctor for treatment or diagnosis looking toward treatment." Weissenberger, Ohio Evidence (Anderson 1996) 171, Section 501.12.

One example of this principle is that medical examinations conducted for the purpose of determining facts solely for a lawsuit are not privileged. *McMillen v. Indus. Comm.* (App.1941), 34 Ohio Law Abs. 435, 441–442, 37 N.E.2d 632, 636–637. Also, a medical examination is not privileged where such an examination does not include treatment or advice and is not for the purpose of alleviating the patient's pain or "curing his malady." *Suetta v. Carnegie–Illinois Steel Corp.* (App.1955), 75 Ohio Law Abs. 487, 489–490, 144 N.E.2d 292, 294.

After reviewing the record, we find that Mossman did not conduct a mental examination for the purpose of treating Hopfer but, rather, he conducted the examination on behalf of Hopfer's counsel to assist them in representing their client during the amenability hearing. Consequently, Mossman and Hopfer did not enjoy a physician-patient relationship as envisioned by R.C. 2317.02, and Hopfer's statements during the mental examination were not privileged.

Mossman testified during the amenability hearing that the purpose of the mental examination was to provide a psychiatric evaluation of Hopfer's amenability to juvenile rehabilitation pursuant to Juv.R. 30 and R.C. 2151.26. Hopfer had received psychiatric treatment at Saint Elizabeth's Hospital for over one month during the examination period, but Mossman was not involved in her treatment. In fact, Mossman did not review Hopfer's treatment records because he believed that those records might interfere with his independent judgment regarding her evaluation. When asked about his goals in performing the mental examination, Mossman testified that his primary goal was to provide Hopfer's counsel with information about Hopfer's amenability to treatment so that the attorneys could fulfill their duties to their client. Most important, Mossman testified that he told Hopfer that he was not her doctor, that nothing she told him would remain confidential, and that the juvenile court and the state would ultimately see the results of the mental examination.

Based upon Mossman's testimony, it appears that he did not examine Hopfer to provide treatment or otherwise alleviate an affliction. Rather, he examined her to rebut the conclusions of Fujimura and Martin and to assist Hopfer's counsel in representing her at the amenability hearing. Accordingly, the physician-patient privilege did not attach to her communications during the mental examination, and the trial court did not err by denying Hopfer's motion *in limine*.

■ Unlike the testimony of a court-appointed psychiatrist or psychologist, Mossman's testimony was admissible in the trial court. Juv.R. 32 permits the juvenile court to order and to utilize a mental examination of the defendant. The person making a mental examination cannot testify about the information received during the examination in any juvenile adjudicatory hearing, except in the amenability hearing itself. Juv.R. 32(B). This rule has been expanded to prohibit the state from using any incriminating evidence obtained during a court-ordered mental examination in any proceeding other than the amenability hearing. *State ex rel. Juvenile v. Hoose* (1988), 43 Ohio App.3d 109, 112, 539 N.E.2d 704, 708. However, this prohibition applies only to mental examinations by court-appointed persons, not to mental examinations by persons hired by the defendant to bolster their case. See Juv.R. 32; *Hoose*, 43 Ohio App.3d at 112, 539 N.E.2d at 708. Therefore, Mossman's testimony regarding the statements made by Hopfer during the mental examination was not prohibited by Juv.R. 32. Further, the evidence given in juvenile court was admissible in the trial court in accordance with the Rules of Evidence. R.C. 2151.358(H). Accordingly, the trial court did not err by permitting the state to impeach Hopfer using Mossman's testimony.

Hopfer's final contention is that the state failed to lay a proper foundation before impeaching Hopfer with Mossman's testimony. The purported foundation would have included questions regarding Hopfer's understanding of the confidentiality of the mental examination. In light of the foregoing, we conclude that any foundation regarding Hopfer's understanding of the confidentiality of the mental examination was irrelevant for the purposes of impeaching Hopfer with Mossman's previous testimony. The state properly cross-examined Hopfer with respect to her contradictory statements.

Hopfer's Eighth Assignment of Error is overruled.

## X

Hopfer's Ninth Assignment of Error is as follows:

"It was error for the court to admit Prosecution Exhibits 24 through 32 into evidence over objection, due to their unfair and prejudicial effect."

Hopfer argues that State's Exhibits 24 through 32, which contained photographs of apparent blood stains in Hopfer's bathroom and a vial of what appeared to be dried blood samples, were not relevant to any material issue in the case and that the exhibits unduly prejudiced the jury against Hopfer. Hopfer maintains that no witness verified that the stains in the photographs or vial were, in fact, human blood and that the jury was forced to believe the state's unverified

representations. Accordingly, Hopfer contends that the trial court erred by admitting the exhibits in evidence.

At trial, sheriff's deputy Glen E. McIntosh testified that, on August 23, 1994, he was dispatched to the Hopfer residence as an evidence technician to assist in the execution of a search warrant. While at the Hopfer residence, McIntosh inspected the hall bathroom and Hopfer's bedroom for evidence. McIntosh testified that he observed several stains in the bathroom, which he believed were dried blood. McIntosh took photographs of the stains and scraped some of the residue into a vial. The photographs and vial were admitted in evidence, over Hopfer's objections, as State's Exhibits 24 through 32.

"Relevant evidence" is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without evidence." Evid.R. 401.

Evidence which is not relevant is not admissible. Evid.R. 402. The trial court may exclude even relevant evidence if it would unduly prejudice the jury.

"Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Evid.R. 403(A).

The trial court enjoys broad discretion in admitting or excluding evidence. *State v. Sage* (1987), 31 Ohio St.3d 173, 182, 31 OBR 375, 382, 510 N.E.2d 343, 350; *State v. Rahman* (1986), 23 Ohio St.3d 146, 152, 23 OBR 315, 320, 492 N.E.2d 401, 407.

With respect to relevance, we find that the trial court did not abuse its discretion by admitting State's Exhibits 24 through 32 in evidence. The photographs of the purported blood stains and the vial of purported blood would have tended to make the fact that Hopfer delivered the baby in the bathroom more probable than if the stains were not there at all. While Hopfer may question the probative weight given to the photographs and the vial, this alone does not diminish the relevancy of the evidence.

Hopfer also argues that the state failed to prove that the stains found in bathroom were, in fact, blood from either Hopfer or her baby. Although no scientific analysis was performed on the stains, McIntosh testified that, based upon his observations, the stains appeared to be dried blood. Hopfer's argument that McIntosh's testimony was inadequate to identify the stains is contrary to the principle that a lay witness may give an opinion that is rationally based on his first-hand perception and is helpful to the understanding of his testimony or to the determination of a fact in issue. Evid.R. 701; see *State v. Stout* (1987), 42 Ohio App.3d 38, 42, 536 N.E.2d 42, 46 ("On the basis of Evid.R. 701, we held that

the officer's opinion that the stain 'looked like or appeared to be' blood was admissible even though the mattress fabric was discarded prior to any testing."). McIntosh testified as to his first-hand perception of the stains and gave his opinion, as a lay witness, albeit a police officer and evidence technician, that the stains appeared to be dried blood. As this court has previously stated, the fact that a police officer is unable to state with scientific certainty that the substance that appeared to him was, in fact, fresh blood goes to the weight rather than the admissibility of the evidence. *State v. Brooks* (1995), 101 Ohio App.3d 260, 266, 655 N.E.2d 418, 422. Accordingly, McIntosh's testimony was sufficient to identify the stains as blood and lay the foundation for State's Exhibits 24 through 32. We cannot agree with Hopfer's contention that the lack of scientific certainty as to the nature of the stains prejudiced her right to a fair trial. Further, Hopfer was free to argue to the jury that the probative value of the blood stains with respect to their origin was minimal.

Hopfer's Ninth Assignment of Error is overruled.

## XI

Hopfer's Tenth Assignment of Error is as follows:

"The court erred in overruling the motion to dismiss count two as unconstitutionally vague."

Hopfer contends that R.C. 2927.01, abuse of a corpse, is unconstitutionally vague and that the trial court should have dismissed that charge against her.

Hopfer argues that R.C. 2927.01(B), which states that "[n]o person, except as authorized by law, shall treat a human corpse in a way that would outrage reasonable community sensibilities," is vague in that the clause "reasonable community sensibilities" cannot be precisely defined. Further, Hopfer argues that such a clause would have different definitions depending upon the community in which the case was brought. In sum, Hopfer contends that the vagueness of the statute violated her right to due process under the Fourteenth Amendment to the United States Constitution.

As Hopfer acknowledged in her appeal, two other jurisdictions have already held that R.C. 2927.01(B) is not unconstitutionally vague. See *State v. Gardner* (1989), 65 Ohio App.3d 24, 27–28, 582 N.E.2d 1014, 1016–1017; *State v. Glover* (1984), 17 Ohio App.3d 256, 258, 17 OBR 524, 526, 479 N.E.2d 901, 904. Hopfer invites us to ignore the holdings of our sister courts and review the statute based upon our first impression. We decline Hopfer's invitation. Instead, we are persuaded by the reasoning of the court in *Glover,* which observed that:

"A criminal statute is not void for vagueness simply because it requires a person to conform to an imprecise but comprehensible normative standard. A statute is vague because it specifies no standard of conduct at all." *Id.* at 258, 17 OBR at 526, 479 N.E.2d at 904.

As the court in *Glover* recognized, the term "reasonable community sensibilities" is one "understood by persons of common intelligence," and a trier of fact could reasonably apply such a standard based upon contemporary community mores. *Id.* We see no reason to modify the thoughtful analysis provided by the *Glover* court.

Hopfer's Tenth Assignment of Error is overruled.

## XII

Hopfer's Eleventh Assignment of Error is as follows:

"The court erred in overruling the defense motion for acquittal."

Hopfer argues that the trial court should have granted her motion for acquittal because the state failed to prove with scientific certainty that the baby girl recovered from the garbage truck was, in fact, her daughter. Hopfer claims that the state failed to perform medical tests to prove the identity of the discovered newborn baby and that the state's circumstantial evidence was not adequate to convict her of murder.

At the close of the state's case, Hopfer moved for acquittal pursuant to Crim.R. 29(A). Hopfer argued that in order to establish that she killed her baby daughter, the state was required to affirmatively prove beyond a reasonable doubt that the baby discovered in the garbage truck was her baby. Hopfer further argued that only blood analysis and DNA tests could satisfy this standard. The trial court denied Hopfer's motion and noted that the circumstantial evidence presented by the state was sufficient to defeat the Crim.R. 29(A) motion.

Crim.R. 29(A) states in part:

"The court on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment, information, or complaint, if the evidence is insufficient to sustain a conviction of such offense or offenses."

In order to sustain a motion for acquittal, the evidence must be of such little probative value that "reasonable minds *must* have had reasonable doubts" as to the accused's guilt. (Emphasis *sic.*) *State v. Bridgeman* (1978), 55 Ohio St.2d 261, 264, 9 O.O.3d 401, 402, 381 N.E.2d 184, 186.

■ In Ohio, circumstantial evidence is sufficient to prove the essential elements in a criminal case.

"Given the extensive precedent in Ohio on the use of circumstantial evidence to prove the commission of a crime and the abundant case law in other jurisdictions on the use of such evidence in homicide prosecutions, we hold that in the absence of a human body, a confession, or other direct evidence of death, circumstantial evidence alone may be sufficient to support a conviction for murder." *State v. Nicely* (1988), 39 Ohio St.3d 147, 154–155, 529 N.E.2d 1236, 1242–1243; see *State v. Griffin* (1979), 13 Ohio App.3d 376, 377–378, 13 OBR 458, 460–461, 469 N.E.2d 1329, 1331–1332.

The only notable exception to this principle is where the inference between the facts proven and the facts sought to be proven is so attenuated that no reasonable mind could find proof beyond a reasonable doubt. *Id.* at 377–378, 13 OBR at 460–461, 469 N.E.2d at 1331.

■ In the case before us, we find the record replete with both direct and circumstantial evidence that a reasonable jury could find to constitute proof beyond a reasonable doubt. As a threshold matter, Hopfer made several admissions regarding the delivery and subsequent disposal of her baby girl to the sheriff's deputies and Mossman, as well as a full confession of the murder to Hanaghan. In addition to this direct evidence, sheriff's deputies discovered the body of a newborn baby girl in two knotted plastic garbage bags, wrapped in two blankets, in the garbage truck that serviced the Hopfer residence—circumstances that were entirely consistent with Hopfer's admissions. Short of some unknown individual placing a newborn baby girl wrapped in two towels and two knotted plastic garbage bags into the garbage truck that serviced Hopfer's residence on the same day that Hopfer gave birth, the evidence presented by the state showed conclusively that the body discovered by sheriff's deputies was Hopfer's daughter. Accordingly, the jury could have found that the evidence presented by the state proved Hopfer's guilt beyond a reasonable doubt.

Hopfer's Eleventh Assignment of Error is overruled.

## XIII

Hopfer's Twelfth Assignment of Error is as follows:

"The court erred in permitting testimony from witness Kaplan beyond her area of expertise."

Hopfer contends that the state's expert witness, Dr. Cynthia Kaplan, rendered an opinion at trial about an area outside of her expertise. Specifically, Hopfer maintains that Kaplan testified about the effects of decomposition and that the study of decomposition is within the exclusive discipline of forensic pathology, a

discipline in which Kaplan denied any expertise. Hopfer further argues that Kaplan's testimony regarding the effects of decomposition prejudiced her right to a fair trial.

During trial, the state introduced Kaplan, a licensed physician who performed over two thousand autopsies on stillborn and infant children, as an expert witness in the fields of anatomic, clinical, and perinatal pathology. Kaplan explicitly denied any expertise in the field of forensic pathology. During direct examination, Kaplan testified that the body of Hopfer's daughter suffered from decomposition and further described the various effects of decomposition on the baby's body weight, umbilical cord, and skin. Hopfer objected to Kaplan's testimony regarding decomposition, but the trial court overruled her objections.

■ A witness may testify as an expert if "the witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony." Evid.R. 702(B). Once qualified, an expert witness may give an opinion only as to matters within her expertise. *Shilling v. Mobile Analytical Serv., Inc.* (1992), 65 Ohio St.3d 252, 255, 602 N.E.2d 1154, 1156–1157.

■ "Pathology" is defined as the study of the nature, cause, and symptoms of disease. Black's Law Dictionary (6 Ed.1990) 1126. "Forensic pathology" is the study of diseases as they relate to legal principles and cases. *Id.* at 649. In contrast, "decomposition" is defined as decay, disintegration, or the separation of compound bodies into their individual parts. Stedman's Medical Dictionary (5 Ed.1982) 366; Dorland's Illustrated Medical Dictionary (27 Ed.1985) 349. Thus, decomposition is a medical phenomenon that may implicate many medical disciplines. Certainly, all fields of pathology include the examination of dead tissue to determine the cause, nature, and symptoms of disease, and, consequently, the effects of decomposition are relevant to more than just the study of forensic pathology. As a licensed physician who performed over two thousand autopsies, Kaplan appeared amply qualified to testify about the effects of decomposition on the body and on the organs that relate to perinatal pathology. Accordingly, the trial court did not err by permitting Kaplan to testify in that regard.

Hopfer's Twelfth Assignment of Error is overruled.

## XIV

Hopfer's Thirteenth Assignment of Error is as follows:

"The murder conviction should be reversed because the jury verdict is against the manifest weight of the evidence."

Hopfer insists that her conviction for murder is contrary to the weight of the evidence presented at trial. Hopfer argues that the state's expert testimony that, even though she was sealed inside two plastic garbage bags, Hopfer's daughter lived from between two to six hours before she died is contrary to the "common-sense" principle that a person cannot survive long without oxygen. Accordingly, Hopfer suggests that we ignore the state's experts' testimony and reverse her murder conviction.

During trial, the state's expert witness, Dr. David M. Smith, testified that, based upon microscopic examination of the tissues of the umbilical cord, Hopfer's baby lived for two to six hours after Hopfer cut her umbilical cord. Similarly, Kaplan testified that, based upon the presence of neutrophils in the bloodstream, the baby lived for at least four hours after Hopfer cut her umbilical cord. Sheriff's deputies testified that Hopfer's baby was discovered wrapped in two towels and inside two plastic garbage bags that were double-knotted, and Smith further testified that the cause of the baby's death was suffocation.

In order to set aside Hopfer's murder conviction, we must determine whether a reasonable juror could have found that the evidence presented at trial proved the essential elements of murder beyond a reasonable doubt.

"[T]he relevant inquiry does not involve how the appellate court might interpret the evidence. Rather, the inquiry is, after viewing the evidence in the light most favorable to the prosecution, whether any reasonable trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 273, 574 N.E.2d 492, 503; see *State v. Waddy* (1992), 63 Ohio St.3d 424, 430, 588 N.E.2d 819, 825.

In the case before us, we conclude that a reasonable jury could have believed the testimony of the state's experts regarding the length of time that Hopfer's baby was alive and the cause of death. The mere fact that Hopfer's daughter died of suffocation does not preclude a finding that she lived for two or more hours before expiring. A reasonable jury could conclude that the small lungs of the newborn baby, and perhaps less than airtight seal on the knotted garbage bags, would have permitted the baby to survive for several hours before exhausting her oxygen supply and succumbing to her own exhalation. Moreover, the jury need not have believed the state's experts' conclusions regarding the period of time that the baby was alive, as long as the jury could reasonably have believed that Hopfer's daughter was alive when Hopfer disposed of her and that the method of disposal caused her death. In short, we conclude that the evidence presented by the state at trial permitted the jury to reasonably find that all of the essential elements of murder were proven beyond a reasonable doubt.

Hopfer's Thirteenth Assignment of Error is overruled.

## XV

Hopfer's Fourteenth Assignment of Error is as follows:

"The court erred in refusing to correct the prosecutor's critical misstatement of law in closing argument."

Hopfer contends that the state misstated the law to the jury in its closing argument and thereby prejudiced her right to a fair trial. During closing argument, the prosecutor made the following statement:

"Ladies and gentlemen, she took that baby girl and she carried her down to the garage. She put her in the garbage pail and she put the lid on top. That's what she told Mary Hanaghan.

"And you know what, ladies and gentlemen? What she told Mary Hanaghan is enough for you to find beyond a reasonable doubt that the defendant killed Baby Hopfer."

Hopfer maintains that her alleged confession, standing alone, is insufficient as a matter of law to convict her of murder. Accordingly, Hopfer argues that the prosecutor's inaccurate statement invited the jury to convict her with evidence that failed to constitute proof beyond a reasonable doubt.

 Hopfer's contention is based upon the principle that a confession is not admissible unless the *corpus delicti* has first been established.

"A confession is inadmissible if the *corpus delicti* has not been established. All that is needed, however, is 'some evidence' (which need not be either equal to proof beyond a reasonable doubt or enough to make a *prima facie* case) tending to show two elements of the body or substance of the crime: (1) the act, and (2) the criminal agency of the act." *State v. King* (1983), 10 Ohio App.3d 161, 10 OBR 214, 460 N.E.2d 1383, paragraph three of the syllabus.

This rule does not require evidence, other than the confession, showing that the accused committed the crime but, rather, requires some evidence that a crime was, in fact, committed. *Id.; Marconi v. State* (App.1932), 13 Ohio Law Abs. 196, 199.

 Perhaps, when viewed in isolation, the prosecutor's statement incorrectly suggested that the jury could convict Hopfer based solely upon her confession without regard to any other evidence. However, we must view the prosecutor's statements in their entirety and within the context of the entire case. *State v. Williams* (1995), 73 Ohio St.3d 153, 169, 652 N.E.2d 721, 734. Even a cursory review of the record reveals ample evidence establishing the *corpus delicti* in this case. There is no question that Hopfer's confession was properly admitted in evidence. Accordingly, the jury could not consider Hopfer's confession as it was

presented at trial without also considering the circumstances that established the *corpus delicti* to support that confession. Thus, the prosecutor's statement could not have persuaded the jury to convict Hopfer on evidence that, as a matter of law, was insufficient to support the conviction, because the confession was properly admitted in evidence and, consequently, provided a sufficient basis for finding guilt beyond a reasonable doubt.

■ Even though we find that the prosecutor's statement was not improper, we also find that, even if improper, the prosecutor's statement did not prejudicially affect a substantial right of the accused. See *State v. Lott* (1990), 51 Ohio St.3d 160, 165, 555 N.E.2d 293, 300. The case before us is similar to the facts in *State v. Maurer* (1984), 15 Ohio St.3d 239, 268, 15 OBR 379, 404, 473 N.E.2d 768, 794, in which a prosecutor had made a misstatement of the law regarding the effect of the jury's findings on sentencing. In that case, the court found that "while the prosecutor inaccurately stated the law in a single respect, the admonitions of the court in its charge to the jury remedied any detriment to appellant. Moreover, because the evidence against appellant was so overwhelming, any harmful effect of the prosecutor's comments paled by comparison." *Id.* at 269, 15 OBR at 405, 473 N.E.2d at 795.

As in *Maurer*, the trial court in the case before us instructed the jury on the burden of proof for each element of the crimes charged and admonished the jury that the state needed to prove its case beyond a reasonable doubt for every element. Accordingly, any potential harm caused by the prosecutor's statement was remedied by the trial court's instructions. Moreover, the sheer amount of testimonial and physical evidence presented at trial, which, even without the confession to Hanaghan, would still support a conviction beyond a reasonable doubt, precludes any finding of prejudice arising from the prosecutor's statement.

Hopfer's Fourteenth Assignment of Error is overruled.

## XVI

Hopfer's Fifteenth Assignment of Error is as follows:

"The court erred in refusing to instruct the jury as to the defense of accident and the lesser offense of abuse of a corpse."

Hopfer argues that the trial court improperly failed to instruct the jury that they could convict her of the lesser included offense of abuse of a corpse rather than convict her of the offense of gross abuse of a corpse if the evidence did not support the latter conviction. Hopfer suggests that any act that constitutes a gross abuse of a corpse must necessarily constitute an abuse of a corpse. Further, Hopfer argues that the trial court should have instructed the jury that it could acquit Hopfer of murder based upon the affirmative defense of accident if

the evidence supported such a defense. Hopfer suggests that the jury might have found that she accidentally disposed of the baby without realizing that the baby was alive.

 Abuse and gross abuse of a corpse are crimes set forth in R.C. 2927.01,[3] which states:

"(A) No person, except as authorized by law, shall treat a human corpse in a way that he knows would outrage reasonable family sensibilities.

"(B) No person, except as authorized by law, shall treat a human corpse in a way that would outrage reasonable community sensibilities.

"(C) Whoever violates division (A) of this section is guilty of abuse of a corpse, a misdemeanor of the second degree. Whoever violates division (B) of this section is guilty of gross abuse of a corpse, a felony of the fourth degree."

Although cases interpreting R.C. 2927.01 are scant, courts have distinguished the crimes relating to the treatment of a corpse:

"We find that a rational distinction can be made between conduct or treatment of a corpse which, although it would certainly offend and outrage the family of the deceased, would not necessarily offend and outrage the community in general, and conduct such as existed in this case which would certainly offend and outrage the entire community despite the lack of personal relationship with the deceased." *Gardner*, 65 Ohio App.3d at 28–29, 582 N.E.2d at 1017.

Although it is difficult to envision a circumstance in which an act would offend reasonable community sensibilities without also offending reasonable family sensibilities, the two crimes are further distinguished by the necessary intent required to commit each crime. Abuse of a corpse requires the person to "know" that he would outrage reasonable family sensibilities, whereas gross abuse of a corpse conspicuously omits this knowledge requirement. See R.C. 2927.01. Thus, each crime has at least one unique element that is not present in the other, albeit similar, crime. Accordingly, we do not find that "the greater offense cannot, as statutorily defined, ever be committed without the lesser offense also being committed," and we conclude, therefore, that the crime of abuse of a corpse is not a lesser included offense of the crime of gross abuse of a corpse. *State v. Sibert* (1994), 98 Ohio App.3d 412, 430, 648 N.E.2d 861, 872.[4]

---

**3.** Effective July 1, 1996, R.C. 2927.01 was modified to include several technical changes and to change the crime of gross abuse of a corpse from a felony of the fourth degree to a felony of the fifth degree.

**4.** In addition to our holding that the crime of abuse of a corpse is not a lesser included offense of the crime of gross abuse of a corpse, we also note that a jury instruction regarding this purported lesser included offense was not proper because the evidence presented at trial

■■■ With respect to Hopfer's request for an instruction regarding the affirmative defense of accident, we find that her admitted behavior of disposing of her baby precludes a finding of accident as an affirmative defense for murder.

"A homicide is not excusable on the basis of accident unless it appears from the evidence that at the time of the killing the·offender was acting in a lawful manner and without negligence." *State v. Moore* (1991), 74 Ohio App.3d 334, 344, 598 N.E.2d 1224, 1230.

Even if Hopfer somehow believed that the baby was dead after delivery, her disposal of her daughter's body, by placing the body in two plastic garbage bags and throwing it into the trash can with common refuse, was an illegal act in light of R.C. 2927.01, and her failure to report the baby's death violated R.C. 2921.22(C). At the very least, Hopfer's actions were negligent in that she failed to seek assistance for her newborn daughter or even confirmation of her daughter's death. Accordingly, the evidence presented at trial does not support the affirmative defense of accident, and the trial court properly refused to instruct the jury on this matter.

Hopfer's Fifteenth Assignment of Error is overruled.

## XVII

Hopfer's Sixteenth Assignment of Error is as follows:

"When taken together, the errors cited above constitute cumulative error such that the convictions must be reversed."

In her final assignment of error, Hopfer contends that the cumulative effect of the aforementioned errors, taken together, deprived her of a fair trial.

The court in *State v. DeMarco* (1987), 31 Ohio St.3d 191, 196–197, 31 OBR 390, 395, 509 N.E.2d 1256, 1261, held that:

"Although violations of the Rules of Evidence during trial, singularly, may not rise to the level of prejudicial error, a conviction will be reversed where the cumulative effect of the errors deprives a defendant of the constitutional right to a fair trial."

The only evidentiary error we have found in the case before us was the trial court's failure to disclose Bove's grand jury testimony pursuant to Evid.R.

---

would not have reasonably supported an acquittal of the greater crime of gross abuse of a corpse. "An instruction to the jury on a lesser offense is required only where the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction·upon the lesser offense." *Id.; State v. Thomas* (1988), 40 Ohio St.3d 213, 216, 533 N.E.2d 286, 289. The scope of Hopfer's alleged acts were not limited to offending reasonable family sensibilities, but offended reasonable community sensibilities as well.

613(A). As this was a singular error, we conclude that there was no cumulative effect that could deprive Hopfer of a fair trial.

Hopfer's Sixteenth Assignment of Error is overruled.

## XVIII

All of Hopfer's assignments of error having been overruled, the judgment of the trial court is affirmed.

*Judgment affirmed.*

WOLFF and FREDERICK N. YOUNG, JJ., concur.