[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] OPINION
Defendant-appellant Louis L. Bethley appeals from his conviction and sentence for Murder, with a firearm specification. Bethley contends that the trial court erred by failing to instruct the jury on the defenses of accident and self-defense, and on the issue of mistake of fact. Bethley also contends that the judgment is against the manifest weight of the evidence. Finally, Bethley contends that the trial court erred by not removing a juror who knew and communicated with the decedent's son shortly after voirdire.
We conclude that the evidence in this record did not require the trial court to instruct the jury on the defenses of accident or self-defense, or on the issue of mistake of fact. We also conclude that the judgment is not against the manifest weight of the evidence. Finally, we conclude that the trial court did not err in declining to remove a juror who knew and communicated with the decedent's son shortly after voir dire. Accordingly, the judgment of the trial court is Affirmed.
 I
On May 24, 1995, Bethley was in the home of Henry Wilson. Wilson, a 74-year-old retiree, allegedly owed Bethley money from a past transaction. Also present in Wilson's home at this time was Shelia Johnson, Michelle Trammell and Lisa Wilkinson. Charles Payne was sitting on the front porch.
Crack cocaine had been present in the house, and Bethley, who testified, alleged that Wilson was smoking crack cocaine at this time. At some point, Wilson asked Bethley to leave. The events leading up to this request were the subject of conflicting testimony. Bethley contended that Wilson was jealous of the attention the young women were giving Bethley. Two of the women, who testified, said that Wilson was upset with the language that Bethley was using.
Bethley testified that he agreed to leave, got up, and went out of the dining room and into the living room to the front door, but that the front door was padlocked, and he was unable to leave. Bethley testified that he asked to be let out of the residence, but no one responded. Bethley was aware that Wilson had severely beaten Charles Payne on a prior occasion.
Bethley testified that because he was afraid of Wilson, he picked up a small pistol that he found on the table in the living room. Bethley then went into the archway between the living room and the dining room, and again asked to be let out. Wilson was walking towards a hallway leading to Wilson's bedroom, and did not respond. According to Bethley, he fired a shot, which struck a wall, intending to get Wilson's attention and secure his cooperation. Shelia Johnson ran out of the house at this point.
According to Bethley, Wilson had left the dining room, and was entering the hallway leading back to his bedroom. Bethley was pointing the pistol at the floor. Lisa Wilkinson was going past Bethley, and Bethley raised his arm slightly to avoid contact with her. Lisa Wilkinson struck Bethley's arm, or the gun, and it accidently discharged. The bullet struck Wilson in the neck, fatally wounding him. Bethley saw Wilson fall to the floor, but did not believe that Wilson had been hit. Instead, Bethley believed that Wilson was simply reacting to the second shot by dropping to the floor.
Bethley left the residence and returned to his home. On the way, he disposed of the gun. Bethley left for Chicago on a previously planned trip at 10:00 p.m. that evening. While Bethley was in Chicago, his daughter called him, having heard about the shooting on television. Bethley called his Alcoholics Anonymous sponsor, a retired Dayton police detective, and made arrangements to turn himself in. Bethley was arrested and charged with one count of Murder, with a firearm specification, and two counts of Intimidation of a Witness, both with firearm specifications.
Shelia Johnson and Michelle Trammell both testified on behalf of the State, and substantially contradicted Bethley's testimony. Lisa Wilkinson did not testify.
At the conclusion of the State's case, the trial court found that there was insufficient evidence with respect to one of the Intimidation charges, and dismissed it. Following a jury trial, Bethley was convicted of Murder, with a firearm specification. He was acquitted of the remaining Intimidation count.
From his Murder conviction, Bethley appeals.
 II
Bethley's First Assignment of Error is as follows:
 THE TRIAL COURT ERRED AND PREJUDICED THE APPELLANT BY FAILING TO INSTRUCT THE JURY ON THE DEFENSE OF ACCIDENT.
Bethley sought an instruction on the defense of accident. This would have been a complete defense to the charge, including the lesser-included offense of Involuntary Manslaughter, upon which the jury was also instructed.
A homicide is not excusable on the basis of accident unless it appears from the evidence that at the time of the killing the offender was acting in a lawful manner and without negligence.State v. Hopfer (1996), 112 Ohio App.3d 521, 564; State v. Moore
(1991), 74 Ohio App.3d 334, 344.
We agree with the State that even if Bethley's testimony is credited in full, he was negligent by picking up the gun, brandishing it and intentionally firing the first shot. He was also at least negligent in pointing the gun in the general direction of his unarmed, retreating victim at the time he was allegedly bumped by Lisa Wilkinson. The trial court did instruct the jury that the purpose to cause the death of another is an essential element of the offense of Murder, as follows:
 Purposely. Purpose is to cause the death of another. It is an essential element of the offense of murder. A person acts purposefully when it is his specific intent to cause a certain result.
 It must be established in this case that at the time in question there was present in the mind of the defendant, a specific intention to cause the death of Henry Wilson. Purpose is a decision of mind to do an act with a conscious objective of producing a specific result. To do an act purposefully is to do it intentionally and not accidentally.
Purpose and intent mean the same thing. But the purpose with which a person does an act is known only to himself unless he expresses it to others or indicates it by his conduct. The purpose with which a person does an act is determined from the manner in which it is done, the weapon used and all the other facts and circumstances in evidence. If a wound is inflicted upon a person with a deadly weapon in a manner calculated to destroy life, the with purpose to cause the death may be inferred from the use of the weapon. This inference is none-conclusive and while this inference may be considered in determining the intent, you shall consider all the evidence introduced by the State to indicate the Defendant's intent and all the evidence introduced by the Defendant to indicate his lack of intent in determining whether the Defendants specifically intended to cause the death of Henry Wilson.
(Emphasis added.)
In our view, the instruction actually given by the trial court properly informed the jury that it must consider the possibility that Henry Wilson was killed accidentally, rather than on purpose, in connection with determining Bethley's guilt or innocence of the Murder charge, while avoiding misleading the jury into thinking that accident would also have been a defense to the lesser-included offense of Involuntary Manslaughter, upon which it was also instructed.
Bethley's First Assignment of Error is overruled.
 III
Bethley's Second Assignment of Error is as follows:
 THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT BY REFUSING TO INSTRUCT THE JURY ON MISTAKE OF FACT AND SELF-DEFENSE.
Bethley contends that he presented sufficient evidence to warrant an instruction on self-defense, as well as an instruction that the shooting may have been in self-defense even if Bethley's conclusion that he was in imminent danger of death or great bodily harm and that his only means of escape was in the use of deadly force, was the result of a mistake of fact.
We agree with the State that even if Bethley's testimony is credited in full, it falls short of establishing the defense of self-defense.
 In order to establish self-defense, the following elements must be shown:
 (1) The slayer was not at fault in giving rise to the affray,
 (2) The slayer had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force; and
 (3) the slayer must not have violated any duty to retreat or avoid the danger.
State v. Robbins (1979), 58 Ohio St.2d 74, second paragraph of syllabus.
Even if Bethley's testimony is credited in full, we conclude that his brandishing and firing a gun, and pointing it, even briefly, in the general direction of the decedent, was premature. Although Bethley testified that he feared that Wilson may have been going back to his bedroom to obtain a gun, it is clear that Bethley knew Wilson was not armed at the time of the shooting. Furthermore, from his own testimony, it is clear that when he returned from the living room, he did not seek the assistance of any of the three women present in the dining room to help him to leave the premises, including, specifically, Shelia Johnson, who, by all accounts, was urgently doing just that. This may have involved opening the front door, or identifying some other way to leave the premises.
In our view, Bethley's evidence, credited in full, falls short of establishing that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of lethal force.
Bethley's Second Assignment of Error is overruled.
 IV
Bethley's Third Assignment of Error is as follows:
 THE VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
While a court of appeals has the undoubted power and duty to determine whether a judgment is against the manifest weight of the evidence, it should reverse a conviction only under the most exceptional circumstances. State v. Thompkins (1997),78 Ohio St.3d 380. Furthermore, when the factual issue involves determining the relative credibility of conflicting testimony, an appellate court must give substantial deference to the finder of fact, which saw and heard the witnesses.State v. Lawson (August 22, 1997), Montgomery App. No. 16286, unreported; State v. Harris (October 10, 1997), Clark App. No. 3036, unreported.
Michelle Trammel testified that there was no gun in the house, and that Bethley had the gun pointed at Wilson the entire time. Shelia Johnson testified that as Bethley entered the dining room, gun in hand, she ran past him, out the living room area, and outside through a wide-open front door — past the same front door that Bethley testified was secured by a padlock, so that he could not escape. Neither Trammel's testimony nor Johnson's testimony is inherently incredible.
Bethley contends that the State's theory of the case is against the forensic evidence, which included the following testimony of David A. McMaken, a forensic pathologist and deputy coroner:
 Q. Had you ever determined anything as far as directionality as a result of the wound path examination and actual entrance himself?
 A. The wound track in relationship to the body is right to left, slightly forward, and slightly upward.
 Q. If you could, could you step down and demonstrate for the ladies and gentlemen of the jury, say, with this pen, using my body, show them more or less?
 A. The entrance wound is approximately in this region here. The bullet was recovered from approximately this area. So the direction of the wound track through the body is in a slightly upward direction. * * *
 Q. Doctor, the path of this bullet and its point of entrance into Henry Wilson's body, if you'll look at those two things, that's consistent with a gun being fired on a lower opinion [sic] than the point of entrance?
 A. I have no opinion on that, and the reason being, there are two different variables here; one being the position of body, and one being position of the gun. My description of the directionality of the wound track is just that. This is the direction of the wound track through the body. It does not tell me in which position Mr. Wilson was or which position that the person holding the gun and the gun was in. For illustration, let's just take somebody that is shot in the back and bullet goes straight through them. If you have somebody standing upright, and a gun like this, this gives you front to back direction. But, if you have somebody laying on the ground and somebody standing above them and shooting them, that's still the same front to back directions for the body. My description of the wound track is only in relation to the body. It doesn't tell me anything about the position of the body or position of the gun. So in answer to your question, I have no opinion on that.
 Q. Fair enough, Doctor. In a situation where Mr. Wilson would be walking or standing upright, would it be fair to say that the gun would have been fired on a plain [sic] lower than the entrance wound?
 A. If he was standing upright, with his head in a neutral position, pointed forward, and neither looking up or down, with no rotation or flexion of the head, given those specifics to the scenario, yes, it would be.
To Doctor McMaken's observations, we can only add our own observation that, if Wilson's wound was the result of the second shot fired, upon which all witnesses, including Bethley, agree, then it is entirely possible that Wilson, who was walking away from Bethley at the time, may have been in the process of ducking his head, voluntarily or reflexively, in reaction to the first shot, at the time that he was struck by the second bullet, which could account for the slightly upward direction of the woundpath through his neck.
Bethley's Third Assignment of Error is overruled.
 V
Bethley's Fourth Assignment of Error is as follows:
 THE TRIAL COURT ERRED IN NOT REMOVING A JUROR WHO KNEW AND COMMUNICATED WITH DECEDENT'S SON AFTER VOIR DIRE.
After the voir dire, when counsel and the trial court were outside the courtroom for the purpose of exercising peremptory challenges, one of the jurors, Fred Hamlet, Jr., was observed out in the hallway talking with a man who apparently was the decedent's son, Sam Wilson. Hamlet, who did not know Sam's last name, or, initially, the fact that he was the decedent's son, described this entire conversation as follows:
 Okay. I know him, Sam, really. He was asking me if I'm on a case. I said, "About to be picked as a juror, I guess, hope to be picked." Lady come out. She asked did he know me. He said, "Yeah, and tell him that's his son. Sam."
Hamlet was questioned by the trial court, counsel for the state, and counsel for Bethley. His questioning by counsel for Bethley, in its entirety, is as follows:
 MR. HOBBS: Sir, did you have any discussion in the hallways concerning the facts of this case?
 JUROR HAMLET: Just happened in the jury box, yeah. They picking a jury and he said — Well, that's when the lady come out telling me who he was. Still, I never did know his last name. All I know, it's Sam.
 MR. HOBBS: Have you ever discussed this case with him any time previously?
 JUROR HAMLET: No, no I never. Just first hearing this case.
 MR. HOBBS: Sir, how frequently did you see this Sam person that may or may not be related to Mr. Wilson?
 JUROR HAMLET: First time I have seen him in a long time, long time.
 MR. HOBBS: Okay. And what was the relationship, was it a work relationship?
 JUROR HAMLET: No, just out in the streets. Just long time ago. And I think he used to go with my ex-wife a long time ago, or was talking to her. He was out partying. Clubs.
 MR. HOBBS: Do you feel in any way that this would impact your sitting as a juror in this case?
JUROR HAMLET: No, no.
 MR. HOBBS: Do you have contact with him on a regular basis now?
JUROR HAMLET: No, no. You mean Sam?
MR. HOBBS: Yes, sir.
 JUROR HAMLET: No, that's the first I have seen him in a long time.
 MR. HOBBS: Did he describe for you in the hallway what his relationship was or why he was interested in this case?
 JUROR HAMLET: No. He was sitting there. I saw him, "Hi, how are you doing." I thought he may be somewhere else in Court. He asked, was I in the courtroom. I said, "Yeah." That's what he said. He said, "Sam Wilson is my father," something like that. I said, "Well, got to tell somebody." * * *
 THE COURT: The Court doesn't find anything about this prospective juror that would lend itself to excluding him on the basis of what we have heard here. And I take it, sir, that you'd be able to serve in this capacity as a juror not have any communication, with any persons or talk with anyone else about the case other than your fellow jurors at the time of deliberations. You'd be able to do that, render a fair, impartial verdict in this case?
JUROR HAMLET: Yes.
We agree with the State that the situation in this case does not present as strong a ground for removing the juror as did the circumstances in State v. Jones (September 12, 1997), Montgomery App. No. 16123, unreported, in which we affirmed a trial court's decision not to excuse a juror. We conclude that the trial court did not abuse its discretion in declining to remove juror Hamlet.
Bethley's Fourth Assignment of Error is overruled.
 VI
All of Bethley's assignments of error having been overruled, the judgment of the trial court is Affirmed.
BROGAN and GRADY, JJ., concur.
Copies mailed to:
John J. Amarante
H. Steven Hobbs
Hon. John Petzold