DECISION AND JUDGMENT ENTRY
Appellant, Samantha Wilson, entered no contest pleas in the Lucas County Court of Common Pleas, following a bindover from the Juvenile Division of that court, to one count of involuntary manslaughter (a violation of R.C. 2903.04(A)), one count of aggravated vehicular homicide (a violation of R.C.2903.06(A)(B)(C)), and to one count of failure to comply with the signal of a police officer (a violation of R.C. 2921.331(B) and (C)(2)). The court accepted the pleas, found appellant guilty and sentenced her to serve five years in prison for the involuntary manslaughter conviction, four years in prison for the aggravated vehicular homicide conviction, and sixteen months for the failure to comply with the signal of a police officer conviction. The court ordered that all the sentences be served concurrently.
Appellant now brings this appeal and presents two assignments of error for consideration. The assignments of error are:
"First Assignment of Error
 The Juvenile Court Committed Prejudicial Error When it Transferred Jurisdiction of the Defendant-Appellant to the General Division.
"Second Assignment of Error
 The Defendant-Appellant was Denied the Effective Assistance of Counsel, in Violation of her Sixth Amendment Rights."
We now consider the facts and procedure that led to this appeal.
The record shows that appellant was first charged as a delinquent minor in the Juvenile Division of the Lucas County Court of Common Pleas on September 28, 1998. Five complaints were filed against her including receiving stolen property (a motor vehicle) in violation of R.C. 2913.51, two charges of involuntary manslaughter in violation of R.C. 2903.04(A) and (B), one charge of aggravated vehicular homicide in violation of R.C. 2903.06, and one charge of failure to comply with the signal of a police officer in violation of R.C. 2921.331. At the same time, appellee, the state of Ohio, filed a motion to bind over appellant, who was fifteen at the time she was charged with committing the crimes listed above, to the General Division of the Lucas County Court of Common Pleas for indictment and trial as an adult. The trial court then ordered a medical history report to be prepared regarding appellant.
On October 22, 1998, the Lucas County Court of Common Pleas, Juvenile Division, filed a judgment entry in which it noted it held a hearing on October 15, 1998 on the motion to transfer jurisdiction to the general division of the court.
The juvenile court said that appellant's attorney and the prosecutor: "advised the Court that they agree and stipulate that Samantha Wilson's date of birth is December 27, 1982, and therefore that she was fifteen (15) years of age at the time and date of the alleged offense [sic] as charged, also the alleged offense [sic] occurred in Lucas County, Ohio. The parties further stipulate that probable cause exists as to each and every element of the alleged offenses." The juvenile court then found that probable cause did exist to believe that appellant committed the charged crimes and that the crimes would be felonies if committed by an adult. The juvenile court then said:
 "It is therefore ORDERED that this matter be continued for investigation including a social history by probation, and a mental evaluation to determine whether there are reasonable grounds to believe that Samantha Wilson is not amenable to care or rehabilitation in any facility designed for care, supervision and rehabilitation of delinquent children; and to determine if the safety of the community may require that Samantha Wilson be placed under legal restraint for a period extending beyond the age of her majority."
On December 21, 1998, the juvenile court held a hearing on the second phase of the certification process, to determine whether appellant was not amenable to rehabilitation and whether the safety of the community required that appellant be held in custody past the time she reached the age of majority. Appellant called her probation officer and her guardian ad litem to the stand to testify on her behalf. She also relied upon the court-ordered report from the Court Diagnostic Treatment Center.
Appellant's probation officer testified that she believed appellant should be "kept in the juvenile system with a lengthy incarceration and also treatment." She testified that she had been appellant's probation officer from March to August of 1998. She said she believed appellant needed to be held in custody so that she could receive treatment that she had not voluntarily pursued when she was not held in custody.
On cross-examination, she said that she saw appellant regularly when appellant was in custody at the juvenile facility ("CSI"), but that appellant only kept one appointment with her after her release from CSI. She said that appellant also did not seek private counseling, even though she was under a court order to seek the counseling. On re-direct examination, she said appellant never received counseling while in custody at CSI.
Appellant's guardian ad litem testified next. She said she had worked with appellant since October 1997. She said she first had contact with appellant when appellant came to court for a domestic violence offense. She said appellant alleged that she was being sexually abused by her stepfather. She also said that appellant came into CSI "with bite marks up and down her arm, that she said were done by her mother." The guardian ad litem
conducted an investigation. She testified:
 "Her stepfather admitted to sexually abusing Samantha. He was prosecuted. Her mother admitted to the bite marks and Samantha went into the custody of CSB [Children Services Board]."
The guardian testified that appellant was terminated from probation because appellant did not keep her appointments with her probation officer. The guardian said she was not surprised that appellant began running away from foster homes after CSB obtained custody. She testified that appellant's therapist explained to her that appellant began running away from home due to the sexual abuse from her stepfather and no support from her mother and that running became a habit that needed to be addressed in counseling. The guardian recommended that appellant be kept in the juvenile system.
On cross-examination, the guardian admitted that she had helped make arrangements to transfer custody of appellant to an aunt who lived in Arizona. Appellant asked to be placed with her aunt in the belief she would then be able to see her father, who was divorced from her mother and who lived in Arizona. After three days of being in her aunt's home, appellant ran away. Appellant then resisted being returned to Ohio to the custody of CSB.
On redirect, the guardian testified that appellant's father did spend Christmas with appellant at the aunt's house. However, when appellant had a birthday two days later, appellant's father did not keep his promise to celebrate appellant's birthday with her and told her that he did not want to see her. The guardian said she believed appellant then ran away from her aunt's house because of her disappointment with her father.
In response to a motion from appellant's counsel to admit the report from the Court Diagnostic Treatment Center into evidence, the juvenile court replied that it was already in evidence because it was court ordered. The report showed that appellant had a history of repeatedly running away (at least twenty times since 1997). Appellant told her evaluator that she lived in Arizona with her parents until they divorced in 1985. Her mother then moved them to Toledo, Ohio. Her father and his parents came to Toledo, kidnaped appellant and her sister, and took them to Arizona. Appellant lived there with her father for almost six years until her mother found them.
When appellant returned to Toledo, she moved in with her mother and her mother's live-in boyfriend (referred to as her stepfather by appellant), who later sexually molested appellant. When she told her mother about the molestation, her mother would not believe her, even after the boyfriend admitted his acts and was sent to jail.
At the age of thirteen, appellant began running away from home. Her mother exhibited concern and interest in her when she ran away.
Appellant had a high I.Q. and performed well in school until she began missing lots of school when she ran away. She began spending time with people who were older than her, and said she was proud of being "street smart" and of getting along well with other people.
The evaluator concluded:
 "In reviewing her juvenile record, there seems to be no evidence whatsoever that this girl would be a danger to the community beyond the age of majority. The unfortunate death of the victim in this accident was, like so much else in Samantha's life, the product of an impulsive or reckless act.
"* * *
 "The combination of a past history of sexual abuse (with the associated run-aways [sic], signs of both a depression and character pathology all point to a girl who at this point has been inadequately treated from a psychiatric standpoint. There is nothing to indicate that this case is beyond the realm of what could be legitimately treated within the juvenile justice system. Considering the malleability of her character, placement in the adult system would at this time appear to be premature. She has clearly not exhausted the facilities provided by DYS."
The juvenile court heard arguments from the prosecutor and from appellant's attorney. The juvenile court then took the issue under advisement.
On December 23, 1998, the juvenile court filed a judgment entry in which it said:
 "The Court finds, notwithstanding the findings of the mental examination, that the defendant Samantha Wilson is not amenable to rehabilitation in a facility designed for that purpose and community safety may require her incarceration beyond the age of twenty-one (21). In so finding, the Court considered all relevant factors including the defendant's social history, school records, delinquency records and attempts at rehabilitation."
The juvenile court then granted appellee's motion and transferred appellant to the jurisdiction of the general division for indictment and trial as an adult. Appellant filed a motion for reconsideration, which was apparently denied as appellant's case was transferred to the jurisdiction of the general division.
The grand jury sitting in Lucas County subsequently indicted appellant for all five charges that were originally filed against her as complaints for delinquency in the juvenile court. Appellant entered no contest pleas to three of the charges and the court nolled the remaining two charges at the request of appellee. Appellee made the following statement of facts after appellant entered her no contest pleas:
 "Your Honor, the State would have shown that back on September 26, 1998, just after midnight, that Toledo Police received a call that a disturbance was taking place in the 800 block of Kingston, that they were dispatched Code 3. As this Court is aware, that's lights and sirens.
 "As they approached the area they were advised — Unit 340 of the Toledo Police, they were advised the vehicle — or person that had been involved had just left by vehicle.
 "The cruiser then turned off their siren and lights, but then reactivated them to go through an intersection about one block from the 800 block of Kingston. As they activated their overhead lights, were approaching that area where the alleged incident had occurred, they observed a vehicle. The vehicle was subsequently found to be the one driven by this Defendant, Ms. Wilson.
 "According to the crews, the vehicle, upon observing them coming through the intersection with lights activated, immediately pulled to the curb and then pulled away from the curb at a very high rate of speed.
 "The officers believing that this was the vehicle involved in the call that they had been dispatched to started to pursue this vehicle. They activated the rest of their emergency equipment and were pursuing the vehicle southbound on Oak Street.
 "The vehicle accelerated away at a very high rate of speed, and there would have been testimony from Dennis Cole, Toledo police officer and accident reconstruction — trained in accident reconstruction, that as the vehicle entered the intersection of Oak and Fassett heading southbound on Oak, that she was traveling in excess of 77 miles an hour in a 35 mile an hour zone.
 "At the same time that this was taking place and that Ms. Wilson was driving that vehicle — and this vehicle was a 1988 Olds Century registered to Wayne Lockhart. The vehicle had been reported stolen approximately two days prior to this date. Mr. Lockhart had reported he had gone to get some gas Wednesday inside the store, come back out, and the vehicle was missing.
 "As that vehicle driven by Ms. Wilson entered that intersection the victim in this case, Mr. Getz [sic], was on his way to work. He was traveling at 34 miles an hour, the evidence would have shown within the legal speed limit of 35 miles per hour, and he had the green light; that he was traveling — he would have been traveling eastbound on Fassett Street. As he entered the intersection he was struck by Ms. Wilson who was traveling again at 77 miles an hour against the red light.
 "Obviously a tremendous impact occurred at that point. The impact such that the vehicle driven by Mr. Getz [sic] was knocked approximately 130 feet south of the intersection after that impact. The Toledo Police crews that had been involved in attempting to stop Ms. Wilson immediately called for life squad.
 "They arrived on the scene as well as St. Vincent Life Flight. Unfortunately Mr. Gets [sic] was dead at the scene.
 "There would have been testimony from Dr. James Patrick, who is the Coroner for Lucas County. He would have testified that in his opinion Mr. Getz [sic] died of cranial cerebral injuries due to blunt force injuries to the head that he received as a result of this automobile accident.
 "Again, the testimony from the officers would have been that they had attempted to stop Ms. Wilson as she pulled away from the curb, but she refused to do so and continued fleeing from them until she struck Mr. Gets' [sic] vehicle.
 "There would have been further testimony that she was the only occupant of that vehicle, that she was injured, and she was subsequently taken from the vehicle, treated, and then arrested after this incident had occurred."
The trial court found appellant guilty of all three charges.
At the sentencing hearing, members of the victim's family and a representative for his fiancé spoke. They explained that the victim was still in his twenties when he was killed, was engaged to be married and planned to adopt his girlfriend's child after the wedding. A wedding date was set and reservations were made when he was killed. Appellant told the court she was truly sorry for her crimes and that if she could change events she wished that she, rather than the victim, died from the accident. The general division court then sentenced appellant as noted above.
In support of her first assignment of error, appellant argues that the juvenile court abused its discretion when it granted the motion to transfer her to the jurisdiction of the general division. She says that the only factor found in R.C. 2151.26 (C) for transferring a juvenile to the general division for trial as an adult that was met in this case was that the crimes appellant was charged with committing would be a felony if committed by an adult. She says: 1) she had no past record of commitment to a juvenile detention facility; 2) she had little if any treatment or counseling through the juvenile system; 3) she was only fifteen at the time she committed the offenses at issue in this case; 4) she had no appropriate family support; 5) her probation officer believed she would benefit from staying in the juvenile system for detention and counseling; and 6) that the medical evaluator also said she would benefit from detention and counseling through the juvenile system. In contrast, she says, no evidence was presented to show that she was not amenable to rehabilitation or that the safety of the community would be at risk if she was held in detention and given psychiatric treatment in the juvenile system until she turned twenty-one.
Appellee responds that the juvenile court did not abuse its discretion when it transferred appellant to the jurisdiction of the general division. Appellee says that it presented evidence to the juvenile court showing that appellant had been offered several services, including counseling, which she chose not to use prior to the events that led to the charges against her in this case. Appellee says this evidence showed that appellant is not amenable to rehabilitation and the seriousness of her crimes shows that the safety of the community "may require legal restraint beyond her [appellant's] majority."
Initially, we note that appellant's no contest plea did not waive any error that occurred in the bindover proceedings. SeeState v. Wilson (1995), 73 Ohio St.3d 40; State v. Crawford
(Nov. 25, 1998), Montgomery App. No. CA 17132, unreported; Statev. Kelly (Nov. 18, 1998), Union App. No. 14-98-26, unreported.
Next, we note that appellee is correct that our standard of review for bindover procedures that are not mandatory is an abuse of discretion standard. As the Second District Court of Appeals noted in a 1996 case:
 "In deciding whether to relinquish its jurisdiction, the juvenile court enjoys a wide latitude of discretion. State v. Carmichael (1973), 35 Ohio St.2d 1, 64 O.O.2d 1, 298 N.E.2d 568, paragraph one of the syllabus. In reviewing the juvenile court's decision to permit the state to prosecute * * * [a juvenile] as an adult, the test is not whether we would have reached the same result upon the evidence before the juvenile court; the test is whether the juvenile court abused the discretion confided in it. As the Supreme Court of Ohio has held, `[t]he term `abuse of discretion' connotes more than an error of law or of judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable.' State v. Adams (1980), 62 Ohio St.2d 151, 157, 16 O.O.3d 169, 173, 404 N.E.2d 144, 148. Accordingly, we must review the juvenile court's decision to determine whether it was unreasonable (that is, without any reasonable basis), arbitrary, or unconscionable." State v. Hopfer (1996), 112 Ohio App.3d 521, 535.
Keeping this standard of review in mind, we carefully reviewed the record and considered the applicable law and the arguments of the parties.
Juv.R. 30(C) governs discretionary transfers of jurisdiction from the juvenile division to the general division of a common pleas court in Ohio. Juv.R. 30(C) provides:
 "(C) Discretionary transfer. In any proceeding in which transfer of a case for criminal prosecution is permitted, but not required, by statute, and in which probable cause is found at the preliminary hearing, the court shall continue the proceeding for full investigation. The investigation shall include a mental examination of the child by a public or private agency or by a person qualified to make the examination. When the investigation is completed, an amenability hearing shall be held to determine whether to transfer jurisdiction. The criteria for transfer shall be as provided by statute." Juv.R. 30(C).
The statute that sets forth the criteria for transfer is R.C.2151.26 which provides, in pertinent part:
 "(C)(1) Except as provided in division (B) of this section and subject to division (C)(4) of this section, after a complaint has been filed alleging that a child is a delinquent child for committing an act that would be a felony if committed by an adult, the court at a hearing may transfer the case for criminal prosecution to the appropriate court having jurisdiction of the offense, after considering the factors specified in division (C)(2) of this section and after making all of the following determinations:
 "(a) The child was fourteen years of age or older at the time of the act charged.
 "(b) There is probable cause to believe that the child committed the act charged.
 "(c) After an investigation, including a mental examination of the child made by a public or private agency or a person qualified to make the examination, and after consideration of all relevant information and factors, including any factor required to be considered under division (C)(2) of this section, that there are reasonable grounds to believe that both of the following criteria are satisfied:
 "(i) The child is not amenable to care or rehabilitation or further care or rehabilitation in any facility designed for the care, supervision, and rehabilitation of delinquent children.
 "(ii) The safety of the community may require that the child be placed under legal restraint, including, if necessary, for the period extending beyond the child's majority.
 "(2) Subject to division (C)(4) of this section, when determining whether to order the transfer of a case for criminal prosecution to the appropriate court having jurisdiction of the offense pursuant to division (C)(1) of this section, the court shall consider all of the following factors in favor of ordering the transfer of the case:
"* * *
 "(b) A victim of the act charged sustained physical harm to the victim's person during the commission of or otherwise as a result of the act charged."
When we consider the applicable law and the facts in this case, we conclude that the juvenile court did abuse its discretion when it transferred jurisdiction over appellant to the general division.
Everyone who testified at the hearing or who submitted a written evaluation of appellant to the juvenile court acknowledged that she had an extensive history of running away and that she had not previously voluntarily taken advantage of services offered to her (such as counseling) when she was released on probation. These were the factors that were cited by appellee in support of its assertion that appellant was not amenable to rehabilitation and that the safety of the community required that she be held past her age of majority. These factors apparently formed the basis of the juvenile court's ruling that appellee's motion to transfer jurisdiction in the case to the general division was granted.[1]
However, when all of the information included in the record is considered, it is apparent that those who had been working with appellant both before and after the incident that led to the charges in this case believed, despite appellant's extensive history of running away, that appellant was amenable to rehabilitation and that she did not pose a danger to the community if she was released when she reached the age of twenty-one. The reports in the record show that appellant first ran from an abysmal family situation; her "stepfather" was sexually molesting her, and her mother did not believe her when she accused him, even after he confessed. Her mother bit her from her shoulder to her hand, and hit her causing bruised on her neck during a dispute at home.
When appellant sought a better home situation by being placed with her aunt near her father in Arizona, she again found herself without the kind of love and support she needed. The social history update included in the reports to the juvenile court shows there was more to the story of why appellant ran away from her aunt's home in Arizona after being there for only three days.
According to the report, her father canceled plans for them to spend her birthday together and told her he did not want to see her any more because his male housemate was jealous of the time he was spending with his daughter. Appellant's aunt permitted her to go out with a friend from her childhood days in Arizona, on condition that appellant call home every hour. Appellant did make hourly calls at first, but then said she lost track of time while at a miniature golf course. She called her aunt after two or three hours were past, and her aunt told her the police were already looking for her. Appellant then stayed away from her aunt's house for several days.
After a week and a half, she called her aunt and asked permission to come home. Her aunt said she would think about the request. The next day, the aunt agreed to meet appellant at a restaurant, and brought the police with her. They took appellant into custody. Eventually, appellant was returned to Ohio and the custody of CSB. Appellant did resist returning to Ohio and she called her aunt and her friend's mother in Arizona begging for a chance to live with them.
The dispositional investigation report confirms that appellant had an extensive history of running away, and that she did not voluntarily take advantage of counseling services or the restitution program offered through the juvenile probation department prior to the incident that led to the charges brought against her in this case. The report contains a notation that a counselor who worked with appellant said the most appropriate setting or placement for appellant would be residential placement out of town. The report lists as a recommendation for disposition that appellant be tried in whatever system, adult or juvenile, that would result in her being held for a longer period of incarceration.
Appellant's school records show that she is capable of achieving good grades, has a high I.Q. and a reading comprehension above her grade level. The school records also show that her grades have not been good since she began her pattern of running away.
While the record therefore does show that appellant had an extensive history of running away and that prior to the accident she had not voluntarily taken advantage of all the services that were offered to her through children's services or the probation department of the juvenile court, that is only a portion of what the record shows. The rest of the information contained in the record that reveals the complete picture shows that the same persons who acknowledged appellant's prior history of repeatedly running away and of failing to voluntarily avail herself of services like counseling, nevertheless, believed she was amenable to rehabilitation and that she would not pose a threat to the safety of the community if she was kept in the juvenile system. To a person, they recommended that appellant receive psychiatric treatment to help her address the underlying issues in her life that led her to form the habit of running away and that she be held in the custody of the Department of Youth Services ("DYS") while she received that treatment. Clearly, therefore, a previously unused option remained in the juvenile system to rehabilitate appellant: hold her in custody while providing her with counseling so that her habit of running away would not prohibit her from learning how to deal with the issues that caused her to form the habit of running away in the first place.
Those who had worked with appellant prior to her actions that led to the charges in this case, like her therapist, her probation officer, and her guardian ad litem, all told the court in written reports that they observed genuine remorse in appellant, an understanding on her part for the first time that her poor choices could injure innocent third parties, and a sincere desire to get help so that she would never again find herself in a similar situation. The mental health professional appointed by the court to perform a mental examination of appellant also told the court appellant was genuinely remorseful, was still moldable, and could be rehabilitated if she received counseling while being held in the custody of DYS. The record further shows that appellant is bright and is capable of learning, but that she has not received support or appropriate training and care from either of her parents or from any other family member.
We conclude that there is nothing in the record that provides a reasonable basis for the juvenile court's ruling that appellant was not amenable to rehabilitation and that the safety of the community required that she be held past her age of majority. Therefore, we find that the juvenile court abused its discretion when it granted appellee's motion to transfer jurisdiction of appellant's case to the general division. Appellant's first assignment of error is well-taken.
Appellant's second assignment of error is rendered moot by our disposition of the first assignment of error. Appellant's convictions and sentences are reversed. This case is remanded to the Lucas County Court of Common Pleas, Juvenile Division, for further proceedings consistent with this decision. Costs assessed to appellee.
JUDGMENT REVERSED.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4, amended 1/1/98.
 _________________________ PETER M. HANDWORK, J.
 JAMES R. SHERCK, J. JUDGE, MARK L. PIETRYKOWSKI, J. JUDGE, CONCUR.
[1] Even though both Juv.R. 30(G) and R.C. 2151.26(F) state that the juvenile court "shall state the reasons for the transfer" the trial court in this case simply recounted that the statutory factors were met without specifying any factual basis for its conclusions.