[Cite as *State vs. Renz*, 2018-Ohio-2869.]

COURT OF APPEALS
RICHLAND COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | : | JUDGES: |
| | : | Hon. William B. Hoffman, P.J. |
| Plaintiff-Appellee | : | Hon. Craig R. Baldwin, J. |
| | : | Hon. Earle E. Wise, Jr., J. |
| -vs- | : | |
| | : | |
| WALTER RENZ | : | Case No. 17CA46 |
| | : | |
| Defendant-Appellant | : | O P I N I O N |

CHARACTER OF PROCEEDING:　　　　　Appeal from the Court of Common
　　　　　　　　　　　　　　　　　　　　　Pleas, Case No. 2016 CR 0480 D

JUDGMENT:　　　　　　　　　　　　　　Affirmed

DATE OF JUDGMENT:　　　　　　　　　July 19, 2018

APPEARANCES:

For Plaintiff-Appellee　　　　　　　　　　For Defendant-Appellant

GARY D. BISHOP,　　　　　　　　　　　WILLIAM T. CRAMER
Prosecuting Attorney　　　　　　　　　　470 Olde Worthington Road
Richland County　　　　　　　　　　　　Suite 200
BY: JOSEPH C. SNYDER　　　　　　　Mansfield, OH  44902
Assistant Prosecuting Attorney
38 South Park Street
Mansfield, OH  44902

*Wise, Earle, J.*

{¶ 1}   Defendant-Appellant Walter T. Renz appeals the April 24, 2017 judgment of conviction and sentence of the Court of Common Pleas of Richland County. Plaintiff-Appellee is the state of Ohio.

FACTS AND PROCEDURAL HISTORY

{¶ 2}   In the summer of 2015, appellant and his girlfriend, Linda Buckner, were the next-door neighbors of Patsy Hudson, who lived alone at 284 Spring Street in Mansfield, Ohio. Hudson, then in her early sixties and on disability, was known to rescue and take care of a large number of cats in or around her house. Her adult son, Lonnie Clevenger, drove trucks for a living, but he periodically stopped at the house to visit. According to Lonnie, Hudson sometimes demonstrated reclusive behaviors, refusing to answer the door or the telephone if she was busy watching television or was simply having a bad day.

{¶ 3}   In the short period of time they were neighbors, appellant and Buckner made a point to become acquainted with Hudson, preformed chores for her, drove her on local errands such as grocery shopping, and thereby learned the pin number for Hudson's debit card.

{¶ 4}   On June 25, 2015, Buckner, using the alias "Cara Longtail," went to the emergency room in Shelby, complaining of pain. She was prescribed Flexeril and Atenolol by Dr. Charles Marti, who was on duty in the E.R. Dr. Marti later testified he wrote appellant the prescription for Atenolol because appellant told hospital personnel she had been prescribed that medication, but she did not have any left. Both Dr. Marti and a

second physician testifying for the State opined that a high enough dose of Atenolol could be fatal.

{¶ 5} At about this time, Buckner told two neighbors she and appellant were taking Hudson on a trip to Florida, although at one point she also stated that she was angry about appellant spending time at Hudson's house. One of the neighbors, Walter Liggett, specifically recalled that appellant and Buckner, in late June 2015, "[s]aid they was [*sic*] going to head back down south and take Patsy [Hudson] with them to her sister in Florida."

{¶ 6} Appellant and Buckner also told this neighbor that they were helping Hudson get rid of her cats. Contrary to this claim however, Hudson was worried someone was poisoning her cats. She told her son, Lonnie Clevenger, about this concern when he visited her in early July 2015. At one point, Hudson also informed police of the situation. She further continued to take some of the cats in for veterinarian appointments in early July. One appointment was scheduled for July 22, 2015, but Hudson did not show up at the veterinary clinic.

{¶ 7} Shortly before July 4, 2015, another neighbor, Mark Clever, overheard an outdoor "yelling and screaming" argument involving appellant, Buckner and Hudson. Then, over the next couple of weeks, he noticed Hudson's mail piling up. Also on July 4th, Hudson called 911 to report someone was killing her cats.

{¶ 8} Nicholas Miller, owner of a local lawn service, was contacted by Hudson in early July 2015. Hudson told him that "her neighbors" had been helping her with yard work, but she was concerned that they had been poisoning her cats so she didn't want them taking further care of her lawn. On July 10, 2015, Miller mowed Hudson's grass and

received payment for his work. This was the last day Hudson was seen alive in the neighborhood.

{¶ 9}   On July 10, 2015, Karissa Gibson, a resident of Shelby, Ohio, was on her lunch break when she drove past an older-model blue van, similar to one owned by appellant, pulled over on the side of a country road. She noticed a "creepy looking" man in the process of dumping something. The next day, she went by again and found a number of cats in the area where the van had been sitting. Some of them had collars. She returned to that spot and eventually, with the help of a neighbor, took in over twenty cats found in the general location.

{¶ 10} Sometime between late July and early August 2015, appellant and Buckner vacated and abandoned the premises at 290 Spring Street, where they had been living. When the landlord, Dwight Wallen, went through the property, he found a ring washer in the basement that was not there when he first rented the house to them. A ring washer was later found to be missing from Hudson's house. Investigators also found a seven-day pill container, with six days' worth of various medications, in Hudson's house.

{¶ 11} On August 3, 2015, another neighbor, Steve Au, called the police after noticing Hudson's mail accumulating, her grass being quite overgrown, and her cats had "vanished."  When Hudson's son, Lonnie, next went to see her in August 2015, there was no one home. However, both of Hudson's vehicles were still at the house. He attempted to call the number he had for his mother, but another female voice answered. Lonnie later observed that his mother's jewelry boxes and two guns were missing from her house.

{¶ 12} Between July 2015 and January 2016, Hudson's debit card was used in various locations throughout the United States including Ohio, Indiana, Missouri,

Nebraska, Montana, South Dakota, Virginia, West Virginia, North Carolina, Tennessee, and Mississippi. At some point the two disposed of appellant's van and purchased an RV. The RV broke down, and was towed to an RV park in Mississippi in December 2015.

{¶ 13} Appellant and Buckner lived in in the RV park for approximately 3 weeks. Christina Cooper also lived in the park and noted appellant and Buckner had no food or supplies and thus provided them with the same. Cooper was friendly with them at first, but over the course of three weeks, things were said that concerned her. On one occasion appellant commented to Cooper he was happy he liked his new neighbors because he had to kill the last one. Appellant made the statement looking and sounding serious, and Buckner smacked him on the arm for making the statement. At the time, Cooper believed appellant was making a joke, but as time wore on she wasn't sure and ceased being as friendly with the two. Right before they left the park, Buckner told her they cut up Hudson's body and scattered the parts all around Mansfield.

{¶ 14}  When the two left the park, they gave Cooper the title to the RV and the keys for helping them. The RV was not operable, but they told her to scrap it. Inside the RV Cooper found a collection of handsaws, axes, a machete, a bayonet and two baseball bats. Cooper called police and reported what she knew, but they did not believe her story.

{¶ 15} Appellant and Buckner remained in contact with Cooper for several weeks because Hudson's debit card had expired and they were expecting delivery of a replacement debit card to their lot in the RV park. She would call several times a day to see if the card had been delivered, always from a different phone number. They returned to pick up the card three weeks later driving a stolen Jeep. Cooper gave them $20 for gas "to get them away from me and my family." The two left, but then returned to repay the

$20 and give Cooper a bag of McDonald's cheeseburgers. Cooper did not eat the burgers as she feared she "knew too much," and that appellant and Buckner were trying to poison her. Cooper then eventually spoke with police in Mansfield.

{¶ 16} Officers from the Mansfield Police Department had commenced an investigation into Hudson's disappearance in December 22, 2015. The officers learned, among other things, of appellant and Buckner's use of Hudson's debit card. Officers were also contacted by Cooper. Based on information provided by Cooper, in January, 2016, officers apprehended appellant and Buckner in Tennessee. It was discovered that Buckner had more than 10 aliases and used multiple dates of birth and social security numbers.

{¶ 17} During transport back to Ohio, appellant told detectives that Hudson died of a heart attack during an argument with Buckner. Appellant stated he wanted to call 911, but Buckner was afraid of police involvement due to an outstanding warrant. When appellant was questioned by detectives, he confessed to cutting up Hudson's body in the bathtub in her house and taking her debit card, but stated Buckner made him do these things. Appellant later led police to various locations where parts of Hudson's dismembered body had been hidden. He told police "I took to help her, help get her to have a heart attack and die." Investigators also found a nightgown, with numerous bloodstains, in the Spring Street residence where appellant and Buckner had been living at the time of Hudson's disappearance. Two of the stains were matched to Buckner. A third stain also contained Buckner's blood, along with an unknown human contributor, described as a "minor DNA profile."

{¶ 18} Hudson's torso was never recovered. The remains that were recovered were skeletal and bore cut marks from dismemberment. An examination of the recovered cervical spine revealed a defect consistent with a stabbing motion as opposed to cutting or sawing.

{¶ 19} On July 15, 2016, appellant was indicted by the Richland County Grand Jury as follows:

{¶ 20} Count I, aggravated murder (R.C. 2903.01(A) ), an unclassified felony; Count II, murder (R.C. 2903.02(A) ), an unclassified felony; Count III, abuse of a corpse (R.C. 2927.01(B) ), a felony of the fifth degree; Count IV, tampering with evidence (R.C. 2921.12(A)(1) ), a felony of the third degree; Count V, receiving stolen property (R.C. 2913.51(A) ), a felony of the fifth degree; Count VI, misuse of credit card (R.C. 2913.21(B)(2)(D)(4), a felony of the fifth degree; Count VII: identity fraud, R.C. 2913.49(B), a felony of the fourth degree.

{¶ 21} The matter proceeded to a jury trial on April 11, 2016. The state's case centered on the theory that appellant, either on his own or along with Buckner, had caused Hudson to overdose on Atenolol, after which the couple scattered Hudson's dismembered body and made use of her money and credit cards. Appellant took the stand in his own defense at trial and repeated his claim that Buckner blackmailed him into disposing of Hudson's body after Hudson suffered a heart attack.

{¶ 22} Following the presentation of evidence, the jury was provided with instructions on aiding and abetting.

{¶ 23} Appellant was found guilty as charged. At sentencing, the trial court merged murder with aggravated murder and imposed a sentence of life without parole on count

one, aggravated murder. The trial court further merged misuse of a credit card and receiving stolen property. The trial court then imposed sentences on counts three, four, five and seven, to be served consecutively to each other and concurrently with count one.

{¶ 24} Appellant filed an appeal and the matter is now before this court for consideration. He raises two assignments of error:

I

{¶ 25} "APPELLANT'S STATE AND FEDERAL RIGHTS TO DUE PROCESS WERE VIOLATED BY CONVICTIONS FOR AGGRAVATED MURDER AND MURDER THAT WERE NOT SUPPORTED BY SUFFICIENT EVIDENCE."

II

{¶ 26} "THE CONVICTIONS FOR AGGRAVATED MURDER AND MURDER WERE AGAINST THE WEIGHT OF THE EVIDENCE."

I, II

{¶ 27} We will address appellant's claimed errors together. In his first assignment of error, appellant argues his convictions for aggravated murder and murder were not supported by sufficient evidence. In his second assignment of error, appellant argues these convictions are also against the manifest weight of the evidence. We disagree.

{¶ 28} On review for sufficiency, a reviewing court is to examine the evidence at trial to determine whether such evidence, if believed, would support a conviction. *State v. Jenks,* 61 Ohio St.3d 259, 574 N.E.2d 492 (1991). "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Jenks* at paragraph two of the syllabus, following *Jackson v. Virginia,* 443 U.S. 307, 99

S.Ct. 2781, 61 L.Ed.2d 560 (1979). On review for manifest weight, a reviewing court is to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine "whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Martin,* 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). See also, *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997). The granting of a new trial "should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *Martin* at 175.

{¶ 29} Appellant was convicted of one count of aggravated murder pursuant to R.C. 2903.01(A) which provides: "No person shall purposely, and with prior calculation and design, cause the death of another or the unlawful termination of another's pregnancy."

{¶ 30} Appellant was further convicted of murder pursuant to R.C. 2903.02(A) which required the state to prove appellant purposely caused Hudson's death.

{¶ 31} Appellant contends no evidence was presented to prove purpose or prior calculation and design. Appellant couches his arguments largely on his own testimony, arguing his testimony at trial was credible, and thus the jury should have acquitted him of aggravated murder and murder. Appellant further suggests that the coroner's ruling on the manner of death as a homicide is unsupported by the evidence.

### Cause and Manner of Death

{¶ 32} The record in the case *sub judice* reveals the coroner listed the "immediate cause of death" regarding Hudson as unknown, noting the state of Hudson's dismembered body parts. Tr. at 1204. The coroner nonetheless considered Hudson's manner of death a homicide because he could not rationalize any other manner of death. Tr. at 1204-1207. Appellant posits the State's theory of the case was that appellant and Buckner, in July 2015, caused Hudson to take an overdose of Atenolol, resulting in her death, in order to steal her identity and use her debit and credit cards, and that after Hudson's death, appellant assisted Buckner in dismembering and scattering Hudson's body. In response, appellee concedes its theory "revolved around" poisoning by an Atenolol overdose, but it urges "any number of possibilities exist" for how Hudson died based upon the evidence at trial. Appellee's Brief at 11. For example, appellee's forensic anthropologist testified there was evidence of possible stabbing with a sharp instrument in one of Hudson's recovered vertebrae. Tr. at 1034-1036.

{¶ 33} We note we addressed the same challenges in codefendant Buckner's appeal. *State v. Buckner*, 5th Dist. App. No. 2016CA101, 2018-Ohio-233. We further note that while there were separate trials, the evidence and testimony presented was consistent between trials. Based on the same trial testimony and argument by appellant, in *Buckner* at ¶ 26-27 we found:

> In a criminal prosecution, a plea of 'not guilty' requires the State to prove all material facts relating to the crime charged, including those facts relating to the *corpus delicti. State v. Nutter* (1970), 22 Ohio St.2d 116, 118,

258 N.E.2d 440. "The *corpus delicti,* meaning the body or substance of a crime, in a homicide prosecution involves two elements, *i.e.* the fact of death and the existence of the criminal agency of another as the cause of death." *State v. Avery,* 7th Dist. Mahoning No. 96 CA 33, 1999 WL 397913, citing *State v. Manago* (1974), 38 Ohio St.2d 223, 226, 313 N.E.2d 10. The Ohio Revised Code states: "The cause of death and the manner and mode in which the death occurred, as delivered by the coroner and incorporated in the coroner's verdict and in the death certificate filed with the division of vital statistics, shall be the legally accepted manner and mode in which such death occurred, and the legally accepted cause of death, unless the court of common pleas of the county in which the death occurred, after a hearing, directs the coroner to change his decision as to such cause and manner and mode of death." R.C. 313.19. However, "expert medical evidence is not always required to establish whether a death occurred as the result of the criminal agency of another." *Avery*, citing *State v. Carter* (1992), 64 Ohio St.3d 218, 226, 594 N.E.2d 595. Additional circumstances surrounding the offense may give rise to further support that the death resulted from the criminal agency of another. *Id.*

{¶ 34} Accordingly, as in *Buckner*, in light of the evidence set forth in our recitation of facts discussed infra, we reject appellant's claim that insufficient evidence was provided as to Hudson's cause and manner of death.

Prior Calculation and Design

{¶ 35} Next, as to appellant's argument regarding the state's failure to prove prior calculation and design, in *Buckner*, we noted at ¶ 30:


   * * * [I]n 1974, the General Assembly reclassified "first-degree murder" as "aggravated murder" and substituted, in lieu of the former element of "deliberate and premeditated malice," a requirement of "prior calculation and design." *See State v. Jenkins* (1976), 48 Ohio App.2d 99, 102, 355 N.E.2d 825. The General Assembly's apparent intention "was to require more than the few moments of deliberation permitted in common law interpretations of the former murder statute, and to require a scheme designed to implement the calculated decision to kill." *State v. Cotton* (1978), 56 Ohio St.2d 8, 11, 381 N.E.2d 190. R.C. 2903.01(A) was amended in 1981, but it retained the term 'prior calculation and design' as a necessary element of aggravated murder. *State v. Taylor* (1997), 78 Ohio St.3d 15, 18, 676 N.E.2d 82. The Ohio Supreme Court has also stated that "it is not possible to formulate a bright-line test that emphatically distinguishes between the presence or absence of 'prior calculation and design' " and that "[i]nstead, each case turns on the particular facts and evidence presented at trial." *Taylor, supra*, at 20, 676 N.E.2d 82.

{¶ 36} In the present case, we find evidence of prior calculation and design was first presented via testimony that appellant and Buckner told neighbors that they were going to take Hudson on a purported trip to Florida. Tr. at 531. Based on this, the jury

could have reasonably inferred that this was part of a plan to allay suspicion in the neighborhood when all three of them disappeared at about the same time. The jury could have also reasonably inferred that the assistance appellant and Buckner provided in driving Hudson to the grocery store was a means of becoming acquainted with Hudson's finances, learning that her only source of income was social security, and obtaining the PIN for her debit card. Tr. At 530, 546-547.

{¶ 37} Also, appellant and Buckner told neighbors that they were going to get rid of Hudson's cats for her. Tr. at 531. This would have been out of character for the victim, as she was known to care greatly for her animals and had even made a formal police report on July 4, 2015 when she became concerned that one of them had been killed and another one poisoned. Tr. at 476-477. The officer who responded to that call for assistance described Hudson as upset, as she often took in stray cats to protect them. Tr. at 468, 473, 476-477. Even until the time of her disappearance, Hudson would take her cats in for veterinary care. Tr. at 416-423. As noted in our recitation of facts, a witness testified that she saw Renz pulled over in a van, appearing to be dumping something, and the witness later found a number of cats stranded in that area. Tr. at 485-486, 490-491. In sum, the record does not show Hudson would have had any intention of "getting rid of" her adopted cats, and the jury could have determined beyond a reasonable doubt that this was part of a scheme to murder Hudson and divert attention from Hudson's house.

{¶ 38} Upon review, we are unpersuaded by appellant's claim that insufficient evidence was provided that he acted with prior calculation and design, either on his own or in complicity with Buckner, in causing Hudson's death.

Purpose

{¶ 39} Circumstantial evidence and direct evidence inherently possess the same probative value. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph one of the syllabus. Circumstantial evidence is sufficient to prove the essential elements in a criminal case. *State v. Willey,* 5th Dist. Guernsey No. 98 CA 6, 1999 WL 3962, citing *State v. Hopfer* (1996), 112 Ohio App.3d 521, 558, 679 N.E.2d 321. Specifically, the element of purpose may be proven by circumstantial evidence. *State v. Buck*, 2017-Ohio-273, 81 N.E.3d 895, ¶ 43, citing *State v. Shue,* 97 Ohio App.3d 459, 466, 646 N.E.2d 1156 (9th Dist.1994).

{¶ 40} As we noted in *Buckner*, under Ohio law, "[d]irect evidence is evidence based on personal observation, including confessions." *State v. Rister*, 6th Dist. Lucas No. L-09-1191, 2012-Ohio-516, 2012 WL 432613, ¶ 12, citing *State v. Nicely*, 39 Ohio St.3d 147, 529 N.E.2d 1236 (1988), paragraph one of the syllabus. A defendant's confession, therefore, may be construed as direct evidence of guilt. See *State v. Corson*, 4th Dist. Pickaway No. 15CA4, 2015-Ohio-5332, 2015 WL 9305491, ¶ 30, citing *State v. Watts*, 1st Dist. Hamilton No. C–810091, 1981 WL 10176, fn. 1.

{¶ 41} The state presented testimony from Cooper who lived near appellant and Buckner in the RV park in Mississippi. Appellant told Cooper he was happy he liked his new neighbors because they had to kill the last one. Tr. at 916. During their stay, appellant and Buckner made other statements to Cooper concerning their activities in Ohio which made her feel unsafe in their presence. Tr. at 923-924, 934-937, 944-945. Right before they left the park, Buckner told Cooper they cut up Hudson's body and scattered the parts all around Mansfield. Tr. at 941.

{¶ 42} We find appellee presented sufficient direct and circumstantial evidence to support appellant's convictions, either as the primary actor or as an aider and abettor, for aggravated murder and murder.

{¶ 43} Finally, appellant argues his testimony at trial was credible, and thus the jury lost its way in convicting him of aggravated murder and murder. However, the weight to be given to the evidence and the credibility of the witnesses are issues for the trier of fact. *State v. DeHass*, 10 Ohio St.2d 230, 231, 227 N.E.2d 212 (1967). The trier of fact "has the best opportunity to view the demeanor, attitude, and credibility of each witness, something that does not translate well on the written page." *Davis v. Flickinger*, 77 Ohio St.3d 415, 418, 674 N.E.2d 1159 (1997). The jury as the trier of fact was free to accept or reject any and all of appellant's testimony and assess appellant's credibility.

{¶ 44} We find, upon reviewing the facts as set forth in detail above, that this is not an " 'exceptional case in which the evidence weighs heavily against the conviction.' " *State v. Thompkins*, 78 Ohio St.3d 380, 386–387, 678 N.E.2d 541 (1997), *quoting State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1983). The jury neither lost its way nor created a miscarriage of justice in convicting appellant.

{¶ 45} Appellant's first and second assignments of error are therefore overruled.

{¶ 46} Accordingly, the judgment of the Richland County Court of Common Pleas is affirmed.

By Wise, Earle, J.

Hoffman, P.J. and

Baldwin, J. concur.

EEW/rw